### UNITED STATES of America, Plaintiff–Appellee,

Millar Elevator Service Company, Plaintiff,

v.

ALL RIGHT, TITLE AND INTEREST IN REAL PROPERTY AND APPURTE-NANCES, thereto known as 143–147 East 23rd Street, New York, New York, Listed as Block 879, Lot 27, which includes the Kenmore Hotel, Defendants,

Jude Hotel Corporation, Claimant–Appellant.

No. 934, Docket 95–6157.

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1996.

Decided Feb. 26, 1996.

Ellen Silverman Zimiles, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Kenneth M. Karas, Steven M. Haber, Assistant United States Attorneys, New York City, on the brief), for Plaintiff–Appellee.

Doris G. Traub, New York City (Traub & Traub, New York City, on the brief), for Claimant–Appellant.

Before: VAN GRAAFEILAND, KEARSE, and MINER, Circuit Judges.

KEARSE, Circuit Judge:

Claimant Jude Hotel Corporation ("Jude") appeals from a final judgment of the United States District Court for the Southern District of New York, Milton Pollack, *Judge,* ordering the forfeiture of certain of Jude's real property, which includes the Kenmore Hotel (the "Kenmore" or the "Hotel"), to the United States pursuant to 21 U.S.C. § 881(a)(7) (1994) on the ground that the Hotel was used to facilitate narcotics activity with the knowledge of Jude and without meaningful efforts by Jude to prevent that activity. After the parties informed the court that there would be no need for a trial and that the only issue would be whether or not the forfeiture violated the Excessive Fines Clause of the Eighth Amendment to the Constitution, the district court granted

summary judgment to the government, finding no violation of that Clause. On appeal, Jude contends (1) that summary judgment was inappropriate because there existed genuine issues of fact to be tried, and (2) that the court erroneously found that there was no Eighth Amendment violation. We conclude that the first contention has been waived and that neither has any merit.

## I. BACKGROUND

Following several years of investigations by federal and local law enforcement officials into narcotics trafficking at the Kenmore Hotel in Manhattan, and after several attempts by local law enforcement officials to have Jude take steps to impede use of the Hotel for narcotics activity, the government commenced the present action in June 1994 seeking civil forfeiture of the Hotel. Following a period of discovery, the government moved for summary judgment. The motion was preceded by a conference with the district judge and a letter to the judge, from the government and Jude jointly, stating that there would be no need for a trial because the only issue was whether the requested forfeiture would violate the Eighth Amendment's Excessive Fines Clause:

> As the parties explained to Your Honor this past Monday, the parties believe that the case can be resolved on papers and need not involve a trial. To avoid a trial, the parties were going to agree on undisputed facts and brief the alleged excessiveness of the forfeiture of the Kenmore.

(Government's letter to the district court dated April 20, 1995, at 1, co-signed by Jude's attorney with the notation "Agreed to By: Barry M. Fallick, Esq. Counsel for Jude Hotel Corp." ("Joint Government–Jude Letter").) The letter went on to state that, although the parties would not provide the court with a stipulation, Jude would not dispute the government's statement of the facts. It stated that, following one additional deposition,

> the Government will move for summary judgment on the forfeiture of the building and submit in support of its motion a statement of undisputed facts, pursuant to Local Rule 3(g). The Government will also

brief the issue of the purported excessiveness of the civil forfeiture of the defendant premises.

> *Claimant Jude Hotel Corporation will brief the excessiveness issue, but will not submit its own set of undisputed facts. In short, there will be no need for a trial.*

(Joint Government–Jude Letter at 1–2 (emphasis added).)

### A. *The Undisputed Facts*

On April 29, 1995, the government moved for summary judgment, supported by, *inter alia*, affidavits of law enforcement agents and deposition testimony from several individuals involved in the operation of the Hotel. The latter group included Truong Dinh Tran ("Truong") who was Jude's president and majority shareholder; Cham Nguyen ("Cham"), Truong's longtime girlfriend who managed the Kenmore Hotel and lived with their children on the second floor of the Hotel, and was a shareholder in Jude; and Leon Aptekar, who had been employed at the Hotel for some 25 years prior to 1994 and who, as the night auditor, had responsibility for billing, record-keeping, and petty cash disbursements. The motion was supported by a 54–paragraph statement pursuant to Rule 3(g) of the Civil Rules for the United States District Courts for the Eastern and Southern Districts of New York ("Rule 3(g)") of the material facts as to which the government contended there was no genuine dispute ("Rule 3(g) Statement"). The Rule 3(g) Statement, thoroughly annotated with citations to the affidavits and the depositions, set out undisputed facts, including those recounted below, with regard to, *inter alia*, Jude's ownership of the Kenmore, the current value of Jude's equity interest in the property, the narcotics activity at the Hotel in 1991–1994, and Jude's knowledge of and responses to that activity.

#### 1. *Narcotics Activity at the Kenmore Hotel*

The 22–story Kenmore Hotel is the largest commercial single-room-occupancy ("SRO") building in New York City, comprising more than 600 single-occupancy units. Many of its residents are elderly, infirm, and/or on public

assistance. Jude, which was incorporated to purchase the Hotel and was owned principally by Truong, bought the Hotel in 1985, not expecting it to make a profit but anticipating that it would be a tax shelter for other companies owned by Truong. "TRUONG had no intention of spending any substantial money on improvements at the Kenmore for at least the first ten years" after Jude purchased the property. (Rule 3(g) Statement ¶ 6.)

Prior to its purchase by Jude, there had been "few if any problems with narcotics trafficking at the Kenmore." (Rule 3(g) Statement ¶ 25.) After Jude bought the Hotel, Truong reduced the staff and insisted that as many rooms as possible be rented, without regard to the identities of the individuals. The staff thereafter rented rooms to all comers, without obtaining identification or conducting any inquiry into their backgrounds.

Beginning at least as early as 1991, the Kenmore was a beehive of narcotics-related activities, including the sale, distribution, preparation, packaging and/or possession of narcotics. According to the records of the New York City Police Department ("NYPD") and the Manhattan District Attorney's Office (collectively the "local authorities"), from January 1, 1991 through June 6, 1994, there were 189 narcotics arrests and/or incidents of reported narcotics-related activity at the Hotel. NYPD officers patrolling the halls and responding to police calls during that period made numerous seizures of crack cocaine and narcotics paraphernalia, including crack vials, plastic baggies used to bundle vials in packages of 50, and implements for "cooking" cocaine into crack. During that 3½–year period, more than 100 individuals were arrested and/or involved in the drug activity; some 70 of them were convicted.

### 2. Jude's Knowledge of and Response to the Narcotics Activity

After learning of narcotics activity in and around the Hotel, Aptekar, the night auditor, notified Cham, the Hotel's manager and part-owner. When Aptekar learned that some of the "security guards" were taking bribes from individuals seeking entry into the building, he informed Cham of that fact as well.

In November 1992, Assistant District Attorney ("ADA") Anne B. Rudman, Director of the Manhattan District Attorney's Office Asset Forfeiture Unit, wrote to Truong about the substantial drug activity at the Hotel. The letter requested a meeting with Truong at the earliest possible time. No such meeting was held until four months later, on February 22, 1993. Truong did not attend but sent his representative, La D. Tran ("Tran").

> At this meeting, Tran was advised there had been at least sixty-five drug arrests during the previous two years, thirty-three arrests for other types of crimes stemming from drug activity, and at least three drug related homicides at the building.... Tran was told the likely cause of the crime problem in the building was that the building itself was being used to facilitate drug trafficking.... Tran claimed the family had owned the Kenmore Hotel since 1985, that the hotel had not been profitable, *that they were aware of the drug problem* and had a security booth to check people and they try to evict persons involved with drugs....

(Rule 3(g) Statement ¶ 29 (emphasis added).) At that meeting, Rudman

> advised Tran to take reasonable steps to try to stop the drug activity, such as: 1) hire full-time uniformed security guards, in that the then current security people at the hotel ... charge people money to come in and purchase drugs, 2) screen prospective tenants, 3) use a surveillance camera, 4) provide a photo identification card for tenants and 5) consider hiring a temporary management team to take over the hotel and clean up the hotel.

(Rule 3(g) Statement ¶ 30.) Rudman followed up this meeting with a letter dated February 25, 1993,

> memorializ[ing] to Tran the recommendations made during the meeting of February 22, 1993, to combat drug activity at the Kenmore Hotel, which included the following:
>> Carefully screen every applicant for an apartment;

Keep every building entrance including the front door locked and install a buzzer system in the front door;

Permit only identified tenants, verified guests of tenants, or others who demonstrate a legitimate reason for being present to enter the premises;

Require each guest to sign in at the lobby front desk and record the name of the tenant whom he/she is visiting;

Require each tenant to display some type of identification (preferably photographic identification) to gain entry into the premises;

Hire twenty-four hour, seven day a week private uniform [*sic*] security guards from an accredited security firm. (Ms. Rudman stated in her letter that the present security guards are either selling drugs or permitting individuals for a sum of money to enter the lobby and buy drugs.)

Be sure management oversees the premises and closely supervises the uniform [*sic*] guards;

Install and operate 24 hours a day a surveillance camera in the lobby;

Post and prominently display house rules which include the prohibition of all illegal controlled substances on the premises and a warning that violators will immediately be evicted. Post notice that there is a surveillance camera in the lobby.

Tightly secure every vacant apartment to prevent intrusion by trespassers. Regularly check that these apartments remain secure;

Keep all public halls, stairwells, and public rooms well lit and clean;

Once a tenant has relinquished his/her room, make sure the key to the room has been returned to management.

This letter informed Tran that officials would seek assistance from the Federal Government in bringing an action pursuant to the federal forfeiture laws in the event that his cooperation was not forthcoming. (Rule 3(g) Statement ¶ 32.) Rudman sent Tran another letter dated March 8, 1993, again urging Jude to consider implementing the steps recommended at the meeting and in her letter of February 25.

At the February 22, 1993 meeting, Rudman asked Tran to provide the local authorities with a list of all Hotel tenants and to sign a form affidavit authorizing NYPD to patrol all floors of the Hotel and arrest trespassers. Tran did not sign the affidavit but took it with him. He eventually returned an affidavit "in which he had made substantial changes," and he never sent the requested list of all tenants. (Rule 3(g) Statement ¶ 30.) At the meeting, Tran had said he would send the Kenmore's manager to meet with Rudman and representatives of NYPD the next day. The manager did not come; Tran called to say that a new manager—a retired police officer—was going to be hired, but there is no evidence that such a manager was ever hired. (Rule 3(g) Statement ¶ 31 n. 2.)

Jude appears to have made scant effort to adopt Rudman's recommendations. For example, Jude "never provided formal identification for tenants." (Rule 3(g) Statement ¶ 39.) The lone security guard at the front desk of the Kenmore was not uniformed, and whenever he left the desk, it was unattended. (Rule 3(g) Statement ¶ 38.) Agents later found what appeared to be "sign-in" sheets that visitors to the Hotel were to sign before entering the building; some of the visitors signed in with such names as "Panama" and "Fat Boy." (Rule 3(g) Statement ¶ 47.) Further, "[w]hile a lock with a buzzer system was installed on the front door to the Kenmore Hotel in 1993, the mechanism functioned for approximately one week and has not been operating since that time." (Rule 3(g) Statement ¶ 37.) A "surveillance camera in the lobby area lead [*sic*] to a monitor on the second floor in the hotel manager's bedroom, . . . . but [wa]s not monitored on a routine basis." (Rule 3(g) Statement ¶ 40.) And "[v]acant apartments in the building were often not secured." (Rule 3(g) Statement ¶ 41.) During a period of little more than two months in late 1993, police officers found crack and drug paraphernalia in several vacant rooms that had been left unsecured. (*E.g.*, Rule 3(g) Statement ¶¶ 14, 16, 17.)

Officers also intercepted drug dealers in hallways and stairwells.

According to Jude's accountant, from October 1, 1992, to September 30, 1993, Jude spent only $1,250 on security services at the Kenmore Hotel. (Rule 3(g) Statement ¶ 43.) From the records produced by Jude, it appears that those who provided security services during this period were "unconnected to any professional company." (Rule 3(g) Statement ¶ 45.) Further,

> [w]hile TRUONG employed some uniformed security guard services in 1993 and 1994, these services terminated their work at the Kenmore Hotel because of TRUONG's failure to pay the bills related to such services.... As replacements for the uniformed security guards, TRUONG hired tenants at the building to work as security guards, many of whom had no training as security guards.

(Rule 3(g) Statement ¶ 23.) Jude paid its new security guards $2.50 per hour. (Rule 3(g) Statement ¶ 27.) Some of these guards took bribes from individuals seeking entry into the building; some steered customers to narcotics suppliers; some were arrested for narcotics activity of their own. (Rule 3(g) Statement ¶ 24.)

In addition to Aptekar's notifying Cham and ADA Rudman's notifying Truong and Tran of the narcotics problem in the Kenmore Hotel, the problem generated "at least nine" newspaper articles on the Hotel beginning in December 1993, describing the Kenmore as, *inter alia,* a crime haven and New York's most dangerous SRO. One article "quote[d] a former security guard who stated that because he was paid so poorly by Tran, 'he had no choice but to take pay-offs from drug dealers who wanted to enter the building.'" (Rule 3(g) Statement ¶ 34.) "After publication of the articles, neither TRUONG nor any representative of the Kenmore Hotel made any attempt to contact ADA Rudman or the United States Attorney's Office." (Rule 3(g) Statement ¶ 35.) And according to housing court records, though Jude instituted more than 500 actions to evict tenants for nonpayment of rent, it never instituted eviction proceedings based on narcotics activity. (Rule 3(g) Statement ¶ 42.)

In 1994, narcotics activity at the Hotel escalated. Of the narcotics-related incidents recorded by the local authorities in 1991–1994, nearly 60% occurred during the first five months of 1994, and nearly 50% occurred during April and May of 1994 alone. Crime in general in the vicinity of the Kenmore, and community complaints about the Kenmore, increased as well. In May 1994, one 86–year–old tenant was found strangled to death in a communal bathroom.

In continuing the Kenmore investigation in 1994, NYPD sent undercover officers ("UCs") and a confidential informant into the Hotel.

> These UCs purchased crack on 13 occasions between on or about March 16, 1994 and May 30, 1994.... The UCs easily gained access to the building and were often "steered" to the crack dealers by the "security guards." .... On certain occasions, they paid a security guard some amount of money, sometimes as little as one dollar, to gain access to the building.

(Rule 3(g) Statement ¶ 20.) One guard offered, for a price, to tell police that the UCs inside the Hotel were there to visit relatives. The confidential informant ("CI"), who had previously provided law enforcement agents with reliable information, posed as a supplier of crack and cocaine and paid security guards as much as $10 to let him into the Hotel. On one such occasion,

> the security guard ... indicated to the CI that he (the security guard) had collected $200 in bribes on that day from people seeking entry into the Kenmore Hotel.... Many of these bribes came from people the security guard knew were entering the Kenmore Hotel to buy crack.

(Rule 3(g) Statement ¶ 21.) On his visits to the Hotel, the CI met several individuals who sold crack; he witnessed several crack sales; and he was physically threatened by several crack dealers who thought he was trying to steal their business.

In early June 1994, the government filed the present civil forfeiture complaint and seized the building. During the seizure, the government found tenant application forms that were incomplete. (Rule 3(g) Statement

¶ 46.) From late 1993 through May 1994, Jude got most of its tenants through referrals from Soho Realty Company. Soho's owner-president Albert Imano testified that though he had applicants fill out a one-page form that asked certain pedigree information, he did not, for the most part, require the prospective tenants to complete the forms; nor did he investigate the background of those individuals before placing them in a building or give the forms to the management of the Kenmore. (Rule 3(g) Statement ¶ 51.)

### 3. *The Value of the Property*

Jude bought the property in 1985 for approximately $7.9 million. However, at the time of the summary judgment motion,

> [b]ased on a market appraisal and the two most recent offers to purchase the Kenmore Hotel, the building ha[d] a gross value of between $3.0 and $3.45 million, without offsetting the value of liens and mortgages on the building.... The mortgages and liens [we]re currently valued at approximately $1.5 million.... Other costs, fees and liabilities of the building total[ed] as much as $1.6 million.

(Rule 3(g) Statement ¶ 8.) In addition, the United States Marshal's Service may file on the property a lien valued between $1 and $4,000,000. (Rule 3(g) Statement ¶ 5.)

### B. *The District Court's Decision*

Jude, in opposing summary judgment, did not submit a counterstatement pursuant to Rule 3(g) and presented no countervailing evidence. Its memorandum of law was devoted solely to the Excessive Fines Clause issue and argued that "since forfeiture is now considered punishment to the owner of the defendant-in-rem property," the question was whether it

> is ... a violation of the Eighth Amendment's "Excessive Fine[ ]s" Clause to order forfeiture of property where the claimant/owner is not involved in the criminal acts underlying the forfeiture, and has derived no personal benefits from the criminal activity.

(Jude's Memorandum of Law in Support of its Claim that Forfeiture of the Defendant-In–Rem Property Violates the Excessive Fines Clause of the Eighth Amendment ("Eighth Amendment Memorandum") at 2.) The memorandum emphasized that Jude and Truong themselves had not been accused of criminal activity, and it argued that "it was apparent" that Jude

> was practically unable to do anything because of the overwhelming [ ]problem of drug trafficking in New York City.... Therefore, as a matter of law, the forfeiture in this case would offend the Eighth Amendment as an "Excessive Fine."

(*Id.* at 16–17.) Although Jude also made several factual assertions in its memorandum, stating for example, that it "did not condone the illegal activity," that it had sought the assistance of the Manhattan District Attorney's Office, that it had "install[ed] additional electronic security equipment including a buzzer system and closed-circuit video camera," that it had "increas[ed] security presence" and allowed the police access to the hotel, and that it had "institut[ed] and prosecut[ed] numerous eviction proceedings in housing court against tenants" (*id.* at 4), it presented no affidavits, documents, or other materials that would have been proper under Fed.R.Civ.P. 56 to support or expand upon its factual assertions, and it took no issue with any fact asserted in the government's Rule 3(g) Statement. Truong sent the court a five-page letter, attempting to contest some of the facts set out in the Rule 3(g) Statement and to paint Jude as having made many attempts to rid the Hotel of narcotics activity; but his letter was unsworn.

The district court, in an Opinion dated June 12, 1995, reported at 888 F.Supp. 580, granted the government's motion for summary judgment. Preliminarily, the court stated that it accepted the facts set out in the Rule 3(g) Statement, pointing out that Jude had "entered into a letter agreement with the government ... to have this matter resolved on the basis of the government's statement of undisputed facts." 888 F.Supp. at 581 n. 1. The court noted its receipt of Truong's letter but stated that Truong's unsworn assertions (and an unsworn response thereto by the government) were not proper submissions on

a summary judgment motion and were not entitled to consideration. *Id.*

On the merits, the court held that the property was subject to forfeiture under 21 U.S.C. § 881(a)(7) as property used to facilitate the commission of narcotics felonies. The court noted that Jude, despite having notice of the substantial narcotics activity at the Kenmore, "did not take any significant steps along the lines suggested by ADA Rudman, even though drug trafficking continued and even increased at the Kenmore Hotel after the meeting with Rudman." 888 F.Supp. at 582. The court noted, *inter alia,* that Jude rented apartments to persons as to whom it had conducted no background inquiry; that Jude failed to provide tenants with photo identifications so that the "guards, were they so inclined, could distinguish the hundreds of tenants that lived at the Kenmore at any given time from the numerous visitors," *id.;* that though Jude installed a front-door buzzer, the buzzer worked for only a week and was never fixed or replaced; that the surveillance camera "went largely unwatched"; that vacant apartments were unsecured, providing narcotics dealers with operating and storage space; that in lieu of trained, uniformed guards, Jude hired as guards Hotel tenants whom it paid only $20 per eight-hour shift; that the guards took bribes for allowing potential drug buyers to enter the building and for steering them to drug suppliers; and that some of the guards also sold drugs themselves. The court concluded that, as a matter of law, Jude could not establish a statutory defense to forfeiture because

> [t]he claimant does not dispute that the Kenmore Hotel was used for drug trafficking and that the claimant knew about the trafficking. The claimant's token efforts to correct the problems that its own mismanagement and neglect helped to create, fall far short of the diligence required to establish lack of consent.

*Id.* at 583.

Turning to Jude's contention that the proposed forfeiture would violate the Excessive Fines Clause, the district court analyzed the question in two ways. First, looking to this Court's decision in *United States v. Certain Real Property and Premises Known as 38 Whalers Cove Drive, Babylon, New York,* 954 F.2d 29 (2d Cir.) ("*Whalers Cove*"), *cert. denied,* 506 U.S. 815, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992), the district court applied a strict proportionality test, analyzing the forfeiture "as though it were a monetary fine equal in magnitude to the claimant's financial interest in the property and compared it to monetary fines that could be imposed on the sort of misconduct in which the claimant engaged." 888 F.Supp. at 583. Using the *Whalers Cove* analysis, the court found the forfeiture was not excessive. The court noted, *inter alia,* that it is a criminal offense for the owner of a building to "manage or control [the] building ... or make available for use, with or without compensation, the building ... for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance," 21 U.S.C. § 856(a)(2) (1994), and that a violation of this section subjects a corporate defendant to a fine of up to $2,000,000. The court observed that this section had been applied to a motel owner "who was aware of (or at least willfully blind to) the fact that the motel had been overrun by drug dealers." 888 F.Supp. at 585 (citing *United States v. Chen,* 913 F.2d 183, 191 (5th Cir.1990)).

The court accepted the valuations of the property set forth in the Rule 3(g) Statement, which were based on a recent appraisal and recent offers of purchase, reduced by the amounts of outstanding mortgages and liens and the cost of bringing the building into conformity with housing regulations. Without considering possible further reductions for any liens that the United States Marshals Service might be entitled to impose, the court found that Jude's equity in the building was between $0 and $500,000 and therefore treated the proposed forfeiture as the equivalent of a monetary fine of up to $500,000. Measuring Jude's maximum $500,000 equity interest against the $2 million potential fine for a violation of § 856(a)(2), the court concluded that the prescribed maximum punishment was at least four times Jude's equity interest in the property, and that, "[v]iewed as punishment for the claimant permitting its

property to be used for drug trafficking, such a fine is not excessive." 888 F.Supp. at 585.

Alternatively, the court found that the proposed forfeiture would not be unconstitutionally excessive under a multi-factor analysis, rather than a strict proportionality test:

> The claimant has urged this Court to apply a multifactor test of the claimant's own invention, under which "the government [must] show that the claimant was culpable and that the property was a material part of serious criminal activity." Claimant's Brief at 14. The claimant argues that the proposed forfeiture would be unconstitutionally excessive under its test, because Jude Hotel's lack of active participation in any narcotics trafficking absolves it of any culpability punishable by forfeiture and because the property itself is not sufficiently related to the trafficking to be forfeited, the Kenmore Hotel being merely a place where drugs happened to be sold.
>
> . . . . Even if the Second Circuit were to apply the claimant's suggested factors, the forfeiture of the Kenmore Hotel would still not violate the Excessive Fines Clause. Both prongs of the claimant's test point in favor of permitting the proposed forfeiture: Jude Hotel is culpable for the drug trafficking at the Kenmore Hotel, and a substantial relationship does exist between the hotel and the trafficking that occurred there.
>
> Jude Hotel's attempt to deny its culpability for the narcotics trafficking is contradicted by the undisputed facts of this case, which establish that the claimant failed to take any significant action to stop drug trafficking at the Kenmore despite receiving ample notice of the problem. The claimant's management of the hotel facilitated its use as a site for drug trafficking: its practice of using inadequately paid and untrained tenants as security guards for the Kenmore Hotel affirmatively facilitated drug trafficking at the Kenmore by creating an incentive for these "guards" to accept bribes in return for access to the hotel and otherwise to cooperate with the drug dealers, its failure to secure vacant apartments supplied drug dealers with locations for storing and selling drugs, and its willful blindness to the dangers of accepting tenants without making any effort to check their backgrounds.
>
> The relationship between the Kenmore Hotel and the drug trafficking that occurred there is sufficiently strong to sustain the proposed forfeiture against an Excessive Fines Clause challenge. The Kenmore Hotel provided seclusion and privacy for the consummation of drug transactions and for the storage of drugs and drug paraphernalia. Four courts that have interpreted the Excessive Fines Clause to require a showing of a relationship between the forfeited property and illegal activity have found this relationship to be sufficient.

*Id.* at 585–86 (footnote omitted).

> The undisputed facts of the instant case demonstrate that, under the claimant's management, the Kenmore Hotel provided a degree of seclusion for drug activity in excess of the seclusion that one could obtain from an ordinary hotel. The physical decay of the hotel itself provided drug traffickers with unlocked, vacant rooms in which to store their drugs, and the defective door buzzer and the location of the security camera monitor facilitated illicit access to the building. The ineffectiveness and corruption of the tenant-guards has already been described.

*Id.* at 586–87.

Judgment was entered in favor of the government, and this appeal followed.

## II. DISCUSSION

On appeal, Jude contends principally that the district court did not apply the proper legal standard for assessing Jude's Eighth Amendment contention and in any event erred in concluding that there was no Excessive Fines Clause violation. It also argues that summary judgment could not properly be granted because there were issues of fact for trial. For the reasons below, we see no error in the district court's constitutional ruling, for though its decision was rendered prior to this Court's opinion in *United States v. Milbrand,* 58 F.3d 841 (2d Cir.1995) ("*Milbrand*"), which established a standard for

analysis of Excessive Fines Clause contentions in civil *in rem* forfeiture cases, and though in deciding a case on direct appeal, we are to apply the law as it exists at the time of our decision of the appeal, *see, e.g., Harper v. Virginia Department of Taxation,* 509 U.S. 86, 87–90, 113 S.Ct. 2510, 2513, 125 L.Ed.2d 74 (1993), we conclude that the district court's findings and alternative analysis were sufficient under the *Milbrand* standard. We also conclude that Jude waived its opportunity to assert that summary judgment was inappropriate on the ground of any factual dispute; and, in any event, we conclude that there were no genuine issues of material fact to be tried and that the undisputed facts showed that the government was entitled to judgment as a matter of law. We address Jude's challenge to the availability of summary judgment first.

## A. *Forfeiture and Summary Judgment*

■ Subchapter I of Title 21, chapter 13, dealing with the enforcement of prohibitions against activities involving controlled substances, *see* 21 U.S.C. §§ 801–904 (1994), subjects to civil forfeiture all real property

> which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited . . . by reason of any act or omission established by th[e] owner to have been committed or omitted without the knowledge or consent of that owner.

*Id.* § 881(a)(7). Once the government has shown probable cause to believe that property is subject to forfeiture, the burden of proof shifts to the claimant opposing forfeiture to establish by a preponderance of the evidence that the narcotics activity on the property occurred without its knowledge or, if it had knowledge, without its consent. *See United States v. Two Parcels of Property Located at 19 & 25 Castle Street,* 31 F.3d 35, 39 (2d Cir.1994).

■ In order to demonstrate a lack of consent, the claimant must prove that it did " '*all* that reasonably could be expected to prevent the illegal activity once [it] learned of [the activity].' " *Id.* (quoting, with emphasis,

*United States v. 141st Street Corp.,* 911 F.2d 870, 879 (2d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991)). As we stated in *United States v. Certain Real Property & Premises, Known as 418 57th Street, Brooklyn, New York,* 922 F.2d 129 (2d Cir.1990):

> Congress intentionally placed a significant burden upon owners to remain accountable for the legitimate use of their property. Therefore, we balance[ ] our determination of the knowledge-consent issue with a stringent interpretation of consent. . . .

*Id.* at 132. "Unless an owner with knowledge can prove every action, reasonable under the circumstances, was taken to curtail the drug-related activity, consent is inferred and the property is subject to forfeiture." *Id.*

In some cases, a claimant's defense of lack of knowledge or lack of consent can be decided as a matter of law. *See, e.g., United States v. One Parcel of Property, Located at 755 Forest Road, Northford, Connecticut,* 985 F.2d 70, 73 (2d Cir.1993) (affirming summary judgment against claimant). In others, a trial will be required. *See, e.g., United States v. Certain Real Property & Premises, Known as 418 57th Street, Brooklyn, New York,* 922 F.2d at 132 (citing "fair dispute" as to whether contacting attorney was all that reasonably could have been done or whether other steps suggested by the government would have been productive); *see also United States v. One Parcel of Property Located At 121 Allen Place,* 75 F.3d 118 (2d Cir.1996) (reversing grant of judgment as a matter of law after jury verdict in favor of claimant on defense of lack of consent).

■ The record of the present case in the district court did not create any need for a trial. Consistent with its pre-motion representation to the district court, Jude did not submit a Rule 3(g) Statement of its own; thus, under Rule 3(g), the facts set out in the government's Rule 3(g) Statement were deemed admitted. Nor did Jude submit any factual materials pursuant to Rule 56. The submission of Truong's unsworn letter was an inappropriate response to the government's motion for summary judgment, and

the factual assertions made in that letter were properly disregarded by the court. *See, e.g.,* Fed.R.Civ.P. 56(e) (response to properly supported summary judgment must be "by affidavits or as otherwise provided in this rule," *see, e.g.,* Fed.R.Civ.P. 56(c) ("depositions, answers to interrogatories, and admissions on file, together with the affidavits")).

Nor can we endorse Jude's tactic of contending on appeal that summary judgment was inappropriate on the ground that there were issues of fact to be tried after it had declined to dispute the government's Rule 3(g) Statement, had made no proper proffer of any factual dispute, and had represented to the district court that "there will be no need for a trial" (Joint Government–Jude Letter at 2). Jude's opportunity to argue that there were genuine issues of fact to be tried was deliberately bypassed.

■ In any event, the record reveals no genuine issue to be tried, either as to the facts set out in the Rule 3(g) Statement or as to what inferences should be drawn therefrom. Those facts as to the scope of the narcotics activity, Jude's knowledge of it, and its lack of any meaningful response to the notice of narcotics activity from many sources, are set forth in some detail in Part I.A. above. Jude came forward with no evidence to controvert the undisputed facts. For example, although its Eighth Amendment Memorandum stated that Jude had installed a front-door buzzer at the Hotel, Jude did not attempt to dispute the fact that the buzzer broke within a week after installation, and it submitted no evidence to show either that it did not know the buzzer had broken or that it made any effort to have the buzzer fixed. Although its Eighth Amendment Memorandum stated that Jude was "practically unable to do anything" to impede the narcotics activity at the hotel, Jude submitted no evidence that it made any effort to, for example, provide tenants with identification cards, or screen visitors, or secure vacant rooms, or keep common areas such as hallways and stairwells well lighted. Although its Eighth Amendment Memorandum stated that Jude had instituted and prosecuted "numerous eviction proceedings in housing court," Jude submitted no evidence to counter the Rule 3(g) Statement's representation that the records of that court revealed more than 500 eviction actions by Jude for nonpayment of rent but not one for narcotics activity. And although its Eighth Amendment Memorandum stated that Jude had "increas[ed] security presence," Jude submitted no evidence to controvert the Rule 3(g) Statement's revelation that Jude hired untrained tenants as guards and paid them at the rate of $2.50 an hour, nor anything to controvert Jude's accountant's evidence that the amount Jude spent on guards for the Kenmore in the one-year period from October 1, 1992, to September 30, 1993, amounted to less than $3.50 a day, *i.e.,* less than 15 cents an hour.

In light of the undisputed facts set out in the Rule 3(g) Statement, no reasonable factfinder could conclude that Jude took all reasonable measures to deter drug trafficking at the Kenmore Hotel.

### B. *The Excessive Fines Clause Argument*

Jude contends that the district court did not apply the proper standard, *i.e.,* that set out in *Milbrand,* 58 F.3d 841, in assessing whether the forfeiture constituted an excessive fine. Although the district court's decision was rendered prior to our decision in *Milbrand,* we conclude that its alternative analysis adequately considered the pertinent *Milbrand* factors.

■ In *Milbrand,* we considered the standard to be applied in assessing the applicability of the Excessive Fines Clause to civil *in rem* forfeitures in the wake of the Supreme Court's post-*Whalers Cove* decision in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). In *Milbrand,* we noted the proportionality analysis that had been used in *Whalers Cove* and we concluded that, although proportionality is a factor to be considered, the proper test is "a multi-factor test combining the principles of both instrumentality and proportionality." 58 F.3d at 847. We stated that the factors to be considered by a court in determining whether a forfeiture violated the Excessive Fines Clause included

(1) the harshness of the forfeiture (*e.g.*, the nature and value of the property and the effect of forfeiture on innocent third parties) in comparison to (a) the gravity of the offense, and (b) the sentence that could be imposed on the perpetrator of such an offense; (2) the relationship between the property and the offense, including whether use of the property in the offense was (a) important to the success of the illegal activity, (b) deliberate and planned or merely incidental and fortuitous, and (c) temporally or spatially extensive; and (3) the role and degree of culpability of the owner of the property.

*Id.* at 847–48.

Although the district court in the present case ruled that the *Whalers Cove* test was applicable, it also considered an alternative multi-factor test and substantially reviewed the above factors of harshness, relationship, and owner culpability. For example, as to harshness, the court concluded, *inter alia,* that the forfeiture would not be disproportionate in light of the fact that Jude's loss of its $0-to-$500,000 equity interest was at most ¼ the sentence that could be imposed on Jude as an owner that had allowed its building to be used for narcotics offenses.

As to the relationship between the property and the offense, the court concluded, *inter alia,* that "a substantial relationship does exist between the hotel and the trafficking that occurred there" because the Kenmore "provided seclusion and privacy for the consummation of drug transactions and for the storage of drugs and drug paraphernalia," 888 F.Supp. at 585–86, and "that, under the claimant's management, the Kenmore Hotel provided a degree of seclusion for drug activity in excess of the seclusion that one could obtain from an ordinary hotel," *id.* at 586–87. The court noted the trade in crack cocaine had been "brisk" between January 1991 and June 6, 1994, and that the "drug dealing was widespread in the building" and "extensive." *Id.* at 581.

As to the degree of the owner's culpability, the court noted that Jude admittedly "knew about the trafficking," and "that its own mismanagement and neglect helped to create" the problems. *Id.* at 583. The court noted

that "[d]espite the extensive nature of the drug trafficking conducted at the Kenmore Hotel, complaints from tenants, and media coverage of the hotel's drug problem, Jude Hotel did virtually nothing to improve conditions," *id.* at 582; that Jude "did not take any significant steps" to hinder such trafficking "[i]n spite of the warnings" and recommendations it had received from local law enforcement officials, *id.;* that Jude had been "willful[ly] blind[ ]" to the dangers of accepting tenants without any screening effort, *id.* at 586; and that Jude "facilitated [the Hotel's] use as a site for drug trafficking" and "affirmatively facilitated drug trafficking" through its use of underpaid guards "by creating an incentive for these 'guards' to accept bribes in return for access to the hotel and otherwise to cooperate with the drug dealers," *id.* at 585–86. The court noted that, after Jude failed to take any meaningful steps despite receiving official warnings, "drug trafficking [at the Kenmore] continued and even increased," *id.* at 582, and concluded that "Jude Hotel is culpable for the drug trafficking at the Kenmore Hotel," *id.* at 585.

■ The district court adequately considered the relevant *Milbrand* factors. Its amply supported conclusions as to those factors demonstrate that the *Milbrand* test was met.

## CONCLUSION

We have considered all of Jude's arguments on this appeal and have found them to be without merit. The judgment of forfeiture is affirmed.