**LEXINGTON INSURANCE COMPANY Plaintiff,**

v.

**Owen and Amy ROUNDS, Chuck Lawrence, Farm and Commercial Properties, Inc. d/b/a Arms Real Estate, and Bazin Brothers Trucking, Inc. Defendants.**

**No. 2:03–CV–41.**

United States District Court, D. Vermont.

Dec. 20, 2004.

Michael B. Flynn, Esq., Boston, MA, for Plaintiff.

Andrew C. Boxer, Esq., Springfield, VT, for Defendant.

## OPINION AND ORDER

SESSIONS, Chief Judge.

As a children's nursery rhyme tells us, the kingdom can be lost all for want of a nail. But the question for the Court is, "Who should have purchased that nail?"

This action arises out of a train derailment that occurred on April 9, 2001 in Westminster, Vermont near a property owned by defendants Owen and Amy Rounds. Plaintiff Lexington Insurance Company ("Lexington") alleges that the negligence of all of the defendants contributed to this accident. Defendants Farm and Commercial Real Estate, Inc. d/b/a Arms Real Estate ("Arms") and Bazin

Brothers Trucking, Inc. ("Bazin") have moved for summary judgment. Both Arms and Bazin claim that the undisputed facts show that the negligent acts of Owen and Amy Rounds ("the Rounds") and Chuck Lawrence ("Lawrence") were an intervening cause that should absolve them from all liability. As Arms and Bazin have raised almost identical arguments in support of their motions for summary judgment, the Court will consider the motions together. For the reasons that follow, the Court **GRANTS** both Arms' and Bazin's motions for summary judgment.

### Factual Background

For the purposes of this motion, the following facts are not disputed by Lexington, Arms or Bazin.[1] In October 1998, Amy and Owen Rounds purchased a lot off Grout Avenue in Westminster, Vermont. The eastern boundary line of the property abuts railroad tracks owned by New England Central Railroad ("NECR"). A raised berm ran the length of this eastern property line. This berm prevented debris or water falling onto the railroad tracks below.

Approximately one year after they purchased their property, the Rounds engaged Arms as the general contractor to deliver and install a modular home. As general contractor, it was Arms' responsibility to coordinate the work of all subcontractors. Arms hired Bazin to perform the excavation work associated with the house. The house was constructed with the front of the house facing west. Bazin and Arms did not alter the berm at the rear of the house.

The Rounds moved into their new home in late January 2000. Within two months,

---

**1.** As Arms and Bazin have attempted to maximize the culpability of Lawrence and the Rounds, it is likely that Lawrence and the Rounds will dispute this presentation of the facts. Nevertheless, for these motions, the Court will consider the factual claims that are undisputed between Arms, Bazin and Lexington.

as Vermont entered its "thaw" or "mud" season, the Rounds found their house surrounded by deep standing water. This water was up to two feet deep in some places. The Rounds' driveway was completely immersed and they had to park their car away from the house. The Rounds were even forced to build a makeshift wooden bridge simply to access their front door. The parties dispute whether the negligence of Arms or Bazin contributed to this problem. Nevertheless, for the purposes of this motion, Arms and Bazin are prepared to concede that their negligence caused the pooling of water around the Rounds' new house.

In April 2000, the Rounds contacted Bazin and told them about their standing water problem and requested that someone visit the house and propose a solution. Bazin sent two agents out to the Rounds' property and proposed digging some holes to allow the water to leach into the ground. However, this was only intended to be a temporary solution to the problem. The Rounds allowed Bazin to dig five holes on their property and paid Bazin $187.50 for this. After Bazin dug these holes, the standing water slowly subsided. The Rounds had contacted Bazin directly and this engagement did not involve Arms.

The Rounds then asked Bazin to propose a permanent solution. During this discussion, Amy Rounds asked about the possibility of digging a trench at the back of the property. Bazin replied that they were unwilling to touch the berm at the rear of the property. Bazin told the Rounds that they were concerned that this could impact the railway tracks below. As an alternative, Bazin proposed raising the grade in front of the house and regrading the sides of the house to provide drainage to the rear of the lot. Bazin would also install two drywells at the rear of the lot to relieve surface water. On April 19, 2000,

Bazin gave the Rounds a quote of $2,900 for this work.

The Rounds, a young working family of limited means, were reluctant to pay so much money to alleviate their flooding problems. Soon after he received the quote from Bazin, Owen Rounds met with Defendant Chuck Lawrence, a local contractor. Lawrence visited the Rounds' property and proposed his own solution for dealing with the drainage problem. Unlike Bazin, Lawrence was prepared to divert some of the water over the back bank of the property. The Rounds mentioned Bazin's concerns about the railroads tracks but Lawrence believed that it could be done safely. The Rounds hired Lawrence.

Lawrence removed some tree stumps on the east side of the property and then leveled the berm. He also cut a swail (or a channel) along the north side of the property to carry water away from the house and to the end of the bank. Lawrence also back dragged the entire property with a backhoe. The Rounds paid Lawrence $1,800 for this work. Prior to the work done by Lawrence, the berm was intact and water had not been intentionally diverted off of the east side of the Rounds' property.

In the spring of 2001, Vermont's infamous mud season began again. The accumulated ice and snow on and near the Rounds' property began to melt and some of the water began to run toward the east side of the property and toward the railroad tracks. This water caused part of the embankment to collapse. Silt, mud and gravel washed down onto the railroad tracks. On April 9, 2001, a NECR train was traveling along the banks of the Connecticut River when it struck this accumulation of debris causing it to derail directly below the Rounds' property. Although nobody was injured, the derailment caused extensive damage with two locomotives,

nine loaded cars and four empty cars going into the Connecticut River. All of the cargo in these cars was lost and substantial environmental cleanup costs were incurred. Overall, the accident cost well over one million dollars.

### Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue as to any material fact and the moving party has shown that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC*, 293 F.3d 550, 554 (2d Cir.2002). The evidence is reviewed in the light most favorable to the nonmoving party, with all ambiguities resolved and all reasonable inferences drawn in its favor. *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir.2000). The moving party has the initial burden of coming forward with those parts of the record it feels demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

### Discussion

Arms and Bazin both argue that, even if they were responsible for the standing water problem, it was the diversion of this water toward the tracks that caused the accident. Arms and Bazin argue that the decision to divert the water was an intervening act that shields them from liability. Both claim that they played no role in the decision to divert water toward the tracks and that this decision is an efficient intervening cause. Arms and Bazin argue that

they could not have foreseen the decision of Lawrence and the Rounds to remove the berm and divert water onto the tracks.

This is a diversity action and the Court is obliged to apply the substantive law of the forum state. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, the Court must look to Vermont law regarding foreseeability and intervening cause.

### A. Foreseeability and Intervening Cause Under Vermont Law

▆▆▆ In Vermont, the elements of negligence are: (1) the existence of a legally cognizable duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) such breach being the proximate cause of the plaintiff's injury; and (4) actual damages. *Powers v. Office of Child Support*, 173 Vt. 390, 398, 795 A.2d 1259, 1265 (2002). As a general rule, foreseeability of harm is relevant to whether there was a legally cognizable duty owed to the plaintiff. "Knowledge of danger on the part of the actor is vital to the creation of the duty to exercise care in any given situation where injury to the person or property of others is at stake." *Thompson v. Green Mountain Power Corp.*, 120 Vt. 478, 483, 144 A.2d 786, 789 (1958). This knowledge of danger can be implied. *See id.* (noting that "the opportunity for knowledge, when available by the exercise of reasonable care, is the equivalent of knowledge itself").

▆▆▆ In this case, Arms and Bazin have conceded that it was foreseeable that a lack of due care on their part could cause flooding on the Rounds' property. Thus, they owed the Rounds a duty of due care. For the purpose of these summary judgment motions, Arms and Bazin have conceded that they breached this duty. Once negligence is established, a defendant is liable for "all the injurious consequences

that flow from his negligence until diverted by the intervention of some efficient cause that makes the injury its own, or until the force set in motion by the negligent act has so far spent itself as to be too small for the law's notice." *LaFaso v. LaFaso*, 126 Vt. 90, 94, 223 A.2d 814, 818 (1966) (quoting *Woodcock's Adm'r v. Hallock*, 98 Vt. 284, 290, 127 A. 380, 382 (1925)). This means that the focus of the Court's inquiry is whether the negligence of Arms and Bazin was a proximate cause of the derailment.

▓▓▓ Arms and Bazin argue that their negligence was not a proximate cause of the derailment because the subsequent diversion of the pooling water toward the tracks was an efficient intervening cause. Vermont has long recognized a defense of efficient intervening cause. *Woodcock's Adm'r v. Hallock*, 98 Vt. 284, 290, 127 A. 380, 382 (1925); *Paton v. Sawyer*, 134 Vt. 598, 600, 370 A.2d 215, 217 (1976). Under the defense of intervening cause, the defendant may escape liability even though he or she has committed a negligent act. To succeed under the defense, the defendant must prove that the intervening act of another party interrupted the chain of causation connecting his or her own act to the harm. *See Woodcock's Adm'r*, 98 Vt. 284, 290, 127 A. 380, 382.

▓▓▓ Negligence by a third party is not always an intervening act that will absolve the original actor from liability. "If negligent conduct by a third person was a foreseeable consequence that, "in the eye of the law, the person charged was bound to anticipate, the causal connection is not broken." " *Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 57–58 (2d Cir.1992) (quoting *Beatty v. Dunn*, 103 Vt. 340, 343, 154 A. 770, 772 (1931)). Thus, as is generally the case in negligence law, "[t]he duty is to foresee, and the defendant will not be excused because of a failure to anticipate

what he was bound to comprehend as a possible consequence." *Paton*, 134 Vt. at 601, 370 A.2d at 217; *see also Estate of Sumner v. Dep't of Soc. and Rehab. Services*, 162 Vt. 628, 629, 649 A.2d 1034, 1036 (1994). Whether the subsequent act was foreseeable is the key issue to consider when deciding whether it is an 'intervening act' in the sense that it should absolve a prior actor of liability. *See LaFaso*, 126 Vt. 90, 94, 223 A.2d 814, 818; *see also* Restatement (Second) of Torts § 447 (1965).

▓▓▓ Arms argues that Vermont law provides an easy way to decide this case. Arms claims that a defendant who is an original actor cannot be held liable if the second actor proceeds despite being aware of the particular danger involved. If this were true, Arms and Bazin could not be liable as Bazin warned the Rounds about the danger involved in diverting water toward the tracks. For the reasons outlined below, the Court is not convinced that Arms and Bazin can be absolved simply because the Rounds were aware of the risk to the tracks. Thus, the Court's holding is based on whether or not Arms and Bazin were bound to foresee the subsequent negligence of the Rounds and Lawrence.

Arms cites *Paton* in support of its claim that an original actor is not liable if the second actor proceeds despite an awareness of the risk of his or her actions. Arms' suggestion does find support in some of *Paton*'s language. *See Paton*, 134 Vt. at 601, 370 A.2d at 217 (suggesting that the first actor is not liable if "the second actor, once aware of the particular danger involved, knowingly and negligently proceeds"); *see also Johnson v. Cone*, 112 Vt. 459, 464–65, 28 A.2d 384, 388 (1942). Nevertheless, the relevant language in *Paton* is dicta. In *Paton*, the court considered an instruction on intervening cause. The lower court had in-

structed the jury that a landowner should be excused by third-party negligence unless the landowner actually anticipated the negligent acts of the third parties. *Paton*, 134 Vt. at 602, 370 A.2d at 218. The court held that "the lower court erred in instructing the jury that *any* negligence by third parties would suffice to prevent the defendant's liability." *Id.* The central holding of *Paton* is "[w]hether or not the negligence of a third person may or may not amount to such an intervening cause turns on the issue of whether or not some such negligent act was something the original actor had a duty to anticipate." *Paton*, 134 Vt. at 601, 370 A.2d at 217. Thus, *Paton* supports the conclusion that the original actor can be held liable for the harm caused by the negligence of a third party.

■ Moreover, Arms' suggestion conflicts with well settled principles of tort law. For example, it has long been established that an original actor can be held liable for the criminal acts of third-parties. *See* Restatement (Second) of Torts § 448 (1965); *Sabia v. State*, 164 Vt. 293, 669 A.2d 1187 (1995) (holding that the Department of Social and Rehabilitation Services could be held liable for the sexual abuse of the plaintiff by her step-father). Generally, an actor can be found liable if, at the time of his negligent conduct, he should have realized that his conduct would provide an opportunity for a person to commit a tort or a crime and that a third party might avail himself of this opportunity. *See* Restatement (Second) of Torts § 448 (1965).

Given that intentional torts and crimes are not always efficient intervening causes, it would be remarkable to reach a different conclusion about recklessness or negligence. Thus, rather than absolve Arms and Bazin simply because the Rounds knew about the risk to the tracks, the Court will focus on whether Arms and Bazin could have foreseen the subsequent negligence of the Rounds and Lawrence. Of course, even if it is not dispositive, the fact that Lawrence and the Rounds diverted the water despite being aware of the risk to the tracks is still highly relevant to whether their actions were foreseeable and an intervening cause. *See* Restatement (Second) of Torts § 442 (1965) (noting that "the degree of culpability of a wrongful act of a third person" is relevant to whether the act is a superceding cause).

## B. Applying the Law

■ The central issue in this case is whether Arms and Bazin were bound to anticipate the acts of Lawrence and the Rounds. If the negligent diversion of the water toward the tracks was not foreseeable, then Arms and Bazin cannot be held liable for that action. Considering the undisputed facts, the Court finds that Arms and Bazin could not have been expected to anticipate the subsequent negligence of Lawrence and the Rounds. Thus, they should not be held liable for the consequences of these acts.

A number of undisputed facts support this conclusion. First, Bazin explicitly warned the Rounds that removal of the berm would risk damage to the tracks below and the Rounds passed this information along to Lawrence. Despite receiving this warning, Lawrence concluded that it was safe to remove the berm and divert water toward the tracks. The Rounds did not decide to remove the berm until after they had received this assurance from Lawrence.

The removal of the berm was not a minor project for the Rounds. Lawrence had to remove tree stumps at the east of the property before he leveled the berm. The Rounds paid Lawrence $1800 for his work. Although this work was cheaper

than the option proposed by Bazin, the Rounds only saved $1100. Taken together, these facts show that the Rounds did not simply act alone as lay people. The Rounds hired a contractor for a significant project and this contractor assured them that it was safe to divert the water. Lexington has provided no admissible evidence suggesting that Arms and Bazin should have foreseen that the Rounds would hire a contractor who would provide negligent advice and work.

 In fact, Lexington's entire case relies on a single piece of inadmissible evidence. Lexington points to a report by John W. Powers of Tighe and Bond consulting engineers (hereafter "Powers Report") in support of its claim that Arms and Bazin should have foreseen the actions of the Rounds. Pl.'s Opp'n to Mot. for Summ. J. at 9 (Doc. 63). The Powers Report includes the following conclusion:

> It should have been foreseeable to Arms, as a knowledgeable local and experienced contractor that a) the dwelling structure as set on the site by Arms, might be susceptible to water accumulating around the site; b) that proper disposal of site drainage would be into the ground, not as a surface discharge over the embankment at the rear of the property toward the Connecticut River and c) that the Rounds might have to remove such surface water and, as lay persons, would be inclined to remove it as a surface discharge over the embankment at the rear of the property toward the Connecticut River.

Powers Report at 1 (Doc. 63, Ex. I). An identical conclusion is reached regarding Bazin. *Id.* at 2. Lexington claims that the Powers Report raises a question of fact as to whether Arms and Bazin should have foreseen the Rounds' actions.

 The Powers Report does not establish a triable issue of fact on negligence. The report is inadequate for a number of reasons. Most importantly, the report is inadmissible hearsay. Essentially, the report is a letter from Mr. Powers to Lexington's attorneys. It is well settled that a district court should disregard an unsworn letter in ruling on a summary judgment motion. *See Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032–33 (2d Cir.1997); *United States v. 143–147 East 23rd St.*, 77 F.3d 648, 657–58 (2d Cir.1996). Lexington is offering the report for the truth of its expert conclusions. This means that Lexington should have submitted these conclusions as part of an affidavit. Fed.R.Civ.P. 56(e). Under Rule 56(e), this affidavit would need to "show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.* In the context of expert conclusions, this means that the affidavit would need to establish that Mr. Powers is qualified as an expert and that he has an adequate basis for his opinions.[2]

 Even if the Court were to ignore the Powers Report's fatal procedural defects, the report still would not raise triable issues of fact. The report simply states that, "as lay persons, [the Rounds]

---

**2.** At oral argument, counsel for Lexington offered to prepare and submit an affidavit from John W. Powers. For a number of reasons, the Court declines this offer. First, as is explained more fully below, even if it had been submitted as an affidavit, the Powers Report would still be inadequate. More importantly, however, Lexington provided no reason for being allowed to make an untimely filing. The local rules allow 30 days to file an opposition to a motion for summary judgment. Local Rule 7.1(c)(2). The Court will not allow Lexington to make further filings simply because the reply briefs demonstrated the inadequacy of its opposition. Lexington should have taken more care to make the appropriate filings within the time afforded by the local rules.

would be inclined" to divert the standing water toward the tracks. Powers Report at 1 (Doc. 63, Ex. I). Mr. Powers offers no explanation of how he arrived at this conclusion. This means that, even if the conclusion was within an affidavit, it would not satisfy Rule 56(e)'s requirement that the affiant show that he or she is competent to testify on the matter. Fed.R.Civ.P. 56(e). Moreover, it is far from clear that Mr. Powers, who presumably is an engineer, is qualified to offer an expert opinion on how someone would be 'inclined' to behave as a lay person. A psychologist, rather than an engineer, might be a better source of an opinion regarding the behavior of lay people. An expert may not offer an opinion outside of his or her area of expertise. *Plourde v. Gladstone*, 190 F.Supp.2d 708, 719 (D.Vt.2002).

Even if Mr. Powers is correct about how lay people would be inclined to act, the Rounds did not act alone as lay persons. The Rounds did not simply pick up shovels and remove the berm themselves. In fact, removing the berm was a major endeavor that cost the Rounds almost $2000. Significantly, the Rounds did not decide to remove the berm and divert the water until a local contractor, Lawrence, assured them that it would be safe to do so. The means that the real question in this case is whether Arms and Bazin could have anticipated that another contractor would provide negligent advice to the Rounds and would then divert water over the berm without the necessary safeguards. The Powers Report fails to address this central issue. Thus, the report's conclusion about how the Rounds might act as lay people has little relevance.

■ The relevant conclusions in the Powers Report are also couched in very speculative language. Mr. Powers concludes that it should have been foreseeable to Arms and Bazin the Rounds "might"

have to remove excess surface water and that they would be "inclined" to divert this water over the berm. Powers Report at 1–2 (Doc. 63, Ex. I). Although expert testimony does not have to be "known to a certainty" to be admissible, the testimony must be more than "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As the Powers Report offers no explanation or basis for its conclusions, it offers only unsupported speculation.

■ In addition to the Powers Report, Lexington also asks the Court to consider a memorandum by hydrogeologist Craig Heindel. Pl.'s Opp'n to Mot. for Summ. J. at 6, 9 (Doc. 63). Mr. Heindel suggests that Bazin's proposed solution to the standing water problem would not have worked. Heindel Mem. at ¶ 15 (Doc. 63, Ex. J). He also claims that the best solution is to divert the water over the bank in a "large-diameter culvert and a rip-rapped emergency drainage swale." *Id.* Once again, the Court may not consider this unsworn statement in a ruling on a summary judgment motion. *Chaiken*, 119 F.3d at 1032–33.

Moreover, Heindel's conclusions undermine Lexington's case against summary judgment. Lexington's entire case is based on the notion that Arms and Bazin should have anticipated that the Rounds would divert water over the berm. But Lexington now suggests that the water can be diverted over the berm safely. Lexington claims that "the only way of dealing with the flooding is to divert the water over the bank, just as the Rounds' attempted to do (albeit with additional safeguards)." Pl.'s Opp'n to Mot. for Summ. J. at 6 (Doc. 63). If this is true, it means that Lexington must show that Arms and Bazin were bound to anticipate more than the possibility that the Rounds would divert water over the bank. To be liable,

Arms and Bazin would have to anticipate that the Rounds would divert the water *and* that the Rounds would do this without the necessary safeguards. Lexington has provided no evidence supporting this conclusion. So, even if the Court were able to consider Mr. Heindel's conclusions, this would only weaken Lexington's position.

Overall, Lexington has provided the Court with no admissible evidence that could lead a reasonable fact finder to conclude that the subsequent acts of Lawrence and the Rounds should have been foreseeable to Arms and Bazin. This means that, under Vermont law, these subsequent acts are an efficient intervening cause. *See, e.g., Paton,* 134 Vt. at 601, 370 A.2d at 217. Thus, Arms and Bazin cannot be held liable for the consequences of these acts.

### Conclusion

For the foregoing reasons, Arms' (Doc. 44) and Bazin's (Doc. 50) motions for summary judgment are granted and the Court finds for Arms on Count III and for Bazin on Count IV of Lexington's First Amended Complaint.