Kevin BROWN, Plaintiff,

v.

Dr. Norman SELWIN, et al., Defendants.

No. 98CIV3008RMBKNF.

United States District Court, S.D. New York.

Sept. 24, 1999.

Caryn A. Rosencrantz, Assist. Atty. Gen, New York City, for Dr. Kotecha.

Dennis A. Vernoia, Pilkington & Leggett, P.C., White Plains, NY, for Saint Francis Hosp.

Maureen C. Lavin, Bartlett, McDonough, Bastone & Monaghan, LLP, New York City, for St. Agnes Hosp.

### DECISION AND ORDER

BERMAN, District Judge.

Kevin Brown ("Brown" or "Plaintiff") filed this *pro se* civil rights action on or about April 29, 1998, against Dr. Norman Selwin, Dr. John Bendhein, Dr. Narendra Kotecha, Dr. George Owens, Physician Assistant Jean Carbone (the "State Defendants"), St. Francis Hospital and St. Agnes Hospital (together with the State Defendants, the "Defendants") pursuant to 42 U.S.C. § 1983. Brown contends that Defendants' actions in providing medical care to him constituted: (i) cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution; (ii) deliberate indifference to Brown's serious medical needs; and (iii) gross negligence. He seeks five million dollars in compensatory and punitive damages.

Defendants now each move for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.").[1]

**For the reasons set forth below, Defendants' motions for summary judgment are granted.**

### I. Background

Plaintiff Brown is an inmate in the custody of the New York State Department of Correctional Services ("DOCS") at Green Haven Correctional Facility ("Green Haven"). (State Defs' 56.1 Statement ¶ 1). Dr. Selwin is employed by DOCS at Green Haven as a physician and acting health services director. (Id. at ¶ 2). Dr. Bendheim is also a physician employed by DOCS at Green Haven. (Id. at ¶ 3). Dr. Kotecha and Dr. Owens are urologists that serve as consultants to DOCS. (Id. at

---

1. The State Defendants, St. Francis Hospital and St. Agnes Hospital each filed separate motions for summary judgment. Each motion, however, refers to and incorporates the others. The Court will address the three motions together herein.

 At the time the State Defendants filed their motion for summary judgment on August 27, 1998, defendant Jean Carbone was not represented by the Office of the Attorney General of the State of New York and was not a part of the motion. Subsequently, defendant Carbone agreed to be represented by the Office of Attorney General; joined in the motion for summary judgment that was filed on August 27, 1998; and filed her own affidavit in support of that motion, dated October 7, 1998. (*See* Letter from Caryn A. Rosencrantz, Assistant Attorney General, dated October 20, 1998, enclosing defendant Carbone's affidavit).

¶¶ 4–5). Ms. Carbone is employed as a Physician Assistant at Clinton Correctional Facility. She had been employed as a Physician Assistant at Green Haven from December 1995 through August 1996. (Carbone Aff. at ¶ 1).

On July 18, 1996, Brown was referred to Dr. Kotecha for treatment of hematuria (i.e., blood in urine), and possible kidney stones. (Id. at ¶ 6). Dr. Kotecha recommended that Brown receive an intravenous pyelogram ("IVP") and begin to strain his urine.[2] (Id.). On August 1, 1996, the results of the IVP were determined to be within normal limits and it was also determined that Brown's hematuria was not caused by any pathology in his kidneys. (Id. at ¶ 7). Dr. Kotecha recommended that Brown receive a cystoscopy, a blood test and urinalysis.[3] (Id.). On August 29, 1996, the results of the blood test and urinalysis were normal. (Id. at ¶ 8).

Brown was scheduled to undergo the cystoscopy on September 3, 1996, but due to hemorrhoid pain, he canceled the appointment. (Id. at ¶ 9). Dr. Kotecha recommended that Brown see Dr. Jordan to determine if surgery were required for Brown's hemorrhoids. (Id.). Dr. Jordan recommended a proctoscopy and surgery. Brown was scheduled to receive both the cystoscopy and proctoscopy on November 8, 1996. (Id. at ¶ 10).

On November 8, 1996, Dr. Kotecha performed the cystoscopy on Brown at St. Francis Hospital. (Id. at ¶ 11) (St. Francis' 56.1 Statement at ¶ 1). The cystoscopy demonstrated a normal urethra and bladder. (Id.).

On January 1, 1997, Brown went to the Green Haven Infirmary ("IPC") complaining of kidney pain. (State Defs' 56.1 Statement at ¶ 12). Dr. Bendheim, who was on call at the IPC, admitted Brown to the IPC, directed Brown to increase his fluid intake, ordered a chemical strip test, and prescribed one tablet of Percocet to be taken every four hours. (Id.). Dr. Selwin discharged Brown from the IPC on January 3, 1997, as asymptomatic and ordered a follow up appointment with the medical clinic.[4] (Id. at ¶ 13). The results of Brown's urine and blood tests, collected on January 3, 1997, were normal. (Id. at ¶ 14).

On August 28, 1997, Brown was referred to Dr. Kotecha for possible renal colic (i.e., pain from kidney stones). (Id. at ¶ 16). Dr. Kotecha diagnosed Brown with a kidney stone on his right side and Brown was admitted to St. Francis Hospital and given pain medication. (Id.). While at St. Francis Hospital, Dr. Kotecha performed a cystoscopy, a right ureteroscopy with manipulation of the kidney stone, and placed a stent in Brown's ureter.[5] (Id. at ¶ 17) (St. Francis' 56.1 Statement at ¶ 1). Dr. Kotecha ordered a blood test and urinalysis and recommended that Brown receive pain medication, including Percocet. (State Defs' 56.1 Statement at ¶ 17). On September 1, 1997, Brown was discharged from

2. An IVP is a procedure in which dye is injected into a vein and, thereafter, excreted by the kidneys. The purpose of an IVP is to determine the cause of the hematuria. (Id.).

3. A cystoscopy is a procedure whereby a scope is inserted through the penis and into the bladder so that the physician can visualize the urinary system. The purpose of a cystoscopy is to determine whether or not the hematuria is caused by a problem in the patient's bladder. (Id.).

4. This was Dr. Selwin's first encounter with Brown. (Id. at ¶ 13).

5. A stent is a spring-like tube that is placed inside the ureter. The purpose of the stent is to keep the ureter open to facilitate the passing of kidney stone and to unblock the kidney and relieve any pain. (Kotecha Aff. at ¶ 11).

St. Francis Hospital and returned to the IPC at Green Haven. (Id. at ¶ 18) (St. Francis' 56.1 Statement at ¶ 1).

Dr. Selwin prescribed one tablet of Percocet to be taken every six hours and Vistaril for Brown's pain. (State Defs' 56.1 Statement at ¶ 18). On September 3, 1997, Dr. Selwin increased Brown's Percocet dosage to one tablet every four hours. (Id. at ¶ 19). Brown received one tablet of Percocet every four hours, as well as Vistaril, until September 12, 1997.(Id.).

On September 11, 1997, Brown was again admitted to St. Francis Hospital where Dr. Kotecha performed a shock wave lithotripsy ("ESWL") on an out-patient basis.[6] (Id. at ¶ 20) (St. Francis' 56.1 Statement at ¶ 1). Brown was discharged from St. Francis Hospital the same day. (St. Francis' 56.1 Statement at ¶ 1).

On September 12, 1997, Dr. Selwin decreased Brown's Percocet dosage to one tablet every eight hours, with Vistaril. (State Defs' 56.1 Statement at ¶ 21). Brown's prescription remained at this dosage until September 17, 1997.(Id.). On September 15, 1997, Brown reported passing small gray flecks (i.e., pieces of stone) in his urine on two different occasions. (Id. at ¶ 22).

On September 18, 1997, Brown's x-ray revealed no opaque kidney stone; Dr. Kotecha interpreted this to mean that the stone had shattered, but not moved. (Id. at ¶ 23). Dr. Kotecha informed Brown that he could undergo another ESWL or ureteroscopy in an effort to help him to pass the stone. (Id.). Dr. Selwin recommended that Brown receive pain medication every six hours. (Id.).

On October 9, 1997, Brown refused a scheduled ESWL that was to be per-

formed by Dr. Kotecha at St. Francis Hospital. (Id. at ¶ 24). Dr. Kotecha advised Brown that even if he would not permit the ESWL, he should, in any event, permit the removal of the stent due to the medical complications that could ultimately result from its continued implantation. (Id.).

On October 14, 1997, Dr. Selwin decreased Brown's Percocet prescription to one tablet every eight hours, as Brown was out of his bed all day and exhibited no signs of pain or discomfort. (Id. at ¶ 25). Moreover, Brown was (again) advised that the stent needed to be removed or else complications could result. (Selwin Aff. at ¶ 18). On October 16, 1997, Brown again refused treatment from Dr. Kotecha. (State Defs' 56.1 Statement at ¶ 26).

On or about October 21, 1997, Dr. Selwin began to consider the possibility of obtaining a second opinion for Brown due to his refusal to be treated by Dr. Kotecha. (Id. at ¶ 27). Brown continued to complain of pain, which was apparently due to the implanted stent. (Id. at ¶ 28). On October 27, 1997, Dr. Selwin increased Brown's Percocet prescription to one tablet every six hours. (Id.).

On November 3, 1997, Dr. Selwin received authorization from the Regional Medical Director to provide Brown with a second opinion (Id. at ¶ 29). On November 7, 1997, in preparation for the second opinion, Dr. Selwin referred Brown to the Fishkill Correctional Facility for an x-ray of his kidney, urinary tract, and bladder. (Id. at ¶ 30). Brown refused to permit the x-ray. (Id.).

On November 18, 1997, Brown was examined by Dr. Owens at St. Agnes Hospital. (Id. at ¶ 31) (St. Agnes' 56.1 Statement at ¶ 2).[7] Brown initially refused to be treated by Dr. Owens, but then changed

---

6. An ESWL is a procedure that entails submerging the patient in water through which high frequency shock waves travel in an effort to shatter the kidney stone. (Id. at ¶ 20).

7. This was Brown's only contact with St. Agnes Hospital, (St. Agnes' 56.1 Statement at ¶ 3).

his mind. (State Defs' 56.1 Statement at ¶ 31) (Owens Aff. at ¶¶ 5–6). Dr. Owens ordered a cat scan of Brown's abdomen and pelvis area. (State Defs' 56.1 Statement at ¶ 32). Brown exhibited no signs of infection and was sent back to Green Haven's IPC to await the test results. (Id.). On November 20, 1997, Brown was discharged from the IPC, but his Percocet prescription remained in effect until December 1, 1997. (Id. at ¶ 33).

Brown's follow-up appointment with Dr. Owens was at the Fishkill Correctional Facility on December 10, 1997. (St. Agnes' 56.1 Statement at ¶ 9). At that time, Dr. Owens informed Brown that the results of the cat scan were negative for any kidney stones, but indicated some calcification of the prostate gland (which is apparently unrelated to stones in the urinary tract). (State Defs' 56.1 Statement at ¶ 34) (St. Agnes' 56.1 Statement at ¶ 9)(Owens Aff. at ¶ 8). Dr. Owens recommended that Brown allow him to remove the stent, but Brown refused. (State Defs' 56.1 Statement at ¶ 34) (Owens Aff. at ¶ 8). Failure to remove a stent can cause calcifications, blood in the urine, the resurgence of kidney stones, kidney infection and pain. (State Defs' 56.1 Statement at ¶ 10) (Owens Aff. at ¶ 10).[8]

## II. *Procedural History*

On or about April 29, 1998, Brown filed a complaint in this Court and motion for a preliminary injunction. In his motion for a preliminary injunction, Brown requested that the Court designate a physician to examine him and to operate to remove his self-diagnosed kidney stones. Following a pretrial conference, and after reviewing Brown's application for a preliminary injunction (including the documents Brown submitted in a binder dated June 2, 1998), as well as the affidavit of Dr. Selwin, United States District Judge Michael B. Mukasey[9] denied Brown's motion. In his Order dated June 18, 1998, Judge Mukasey observed that:

> Although plaintiff insists that he has a kidney as a kidney stone, and that a CT scan indicating to the contrary performed in December 1997 is incorrect, a medical report attached as Exhibit G to the Selwin affidavit reflects that the scan was negative for the presence of a kidney stone. Rather, it appears from the Selwin affidavit and from plaintiff's own documents, ... **that the cause of his distress is his own refusal to permit the removal of a stent, not any indifference to his medical condition, deliberate or otherwise.** (emphasis added).

### Extensions of Brown's Time to File Response

On or about August 27, 1998, prior to the taking of discovery, the State Defen-

---

8. Brown alleges in his o Brown alleges in his complaint that on one unspecified occasion defendant Carbone threatened him with discipline if he continued to complain about bleeding and pain. (Compl.¶¶ 18, 19). In her affidavit, defendant Carbone denies this allegation and states that "[o]n July 13, 1996, I was the Physician Assistant 'on call' for Green Haven's infirmary ('IPC'). Plaintiff came to the IPC for emergency sick call complaining of pain in his left quadrant ('quad') during urination ... While I was not present at Green Haven, the nurse on duty called me for a telephone consultation.... I was informed that an inmate was complaining of left quad pain, but that the pain was not intense or unbearable. I authorized a prescription for 800 mg of Motrin every eight hours and told the nurse to schedule a follow up appointment for the following morning.... I did not speak with plaintiff directly and therefore, I could not have 'threatened' him." (Carbone Aff. at ¶ 4). Brown has not controverted Carbone's affidavit testimony.

9. This case was reassigned from Judge Mukasey to this Court on or about December 29, 1998.

dants filed a motion for summary judgment.[10] By Order dated September 8, 1998, Judge Mukasey directed Brown to serve a written statement of facts in response to the motion for summary judgment by December 24, 1998 **"failing which that motion will be granted by default"** (emphasis added). Following Brown's written application dated December 17, 1998, Judge Mukasey, by Order dated January 4, 1999, directed that "the time in which plaintiff is to respond to defendants' motions for summary judgment is extended to March 26, 1999."

In a letter dated March 3, 1999, Brown wrote to this Court requesting a 60 day extension to file papers in opposition to Defendants' summary judgment motions. By memo endorsement dated March 23, 1999, the Court granted Brown's request for an extension "on the condition that this is Plaintiff's FINAL extension." (emphasis in original).

On May 10, 1999, the Court referred this case to the Honorable Kevin Nathaniel Fox, United States Magistrate Judge, for general pretrial supervision.[11] By Order dated May 20, 1999, Judge Fox gave Brown yet another extension to "serve and file his summary judgment opposition papers on or before June 17, 1999." This extension was granted to accommodate Brown who had "agreed to be examined anew by a urologist, other than the urologists who have previously examined him

and who are the subjects of the instant action." (Fox Order dated May 19, 1999). By Order dated June 30, 1999, Judge Fox further extended the time by which Brown was to respond to the summary judgment motions to August 19, 1999 in order to allow Brown to undergo an IVP test at St. Agnes Hospital.

**Brown failed to respond to the summary judgment motion, and by letter dated August 23, 1999, the State Defendants asked the Court to grant the summary judgment motions by default due to Brown's failure to respond.**

Following a telephonic conference between and among Judge Fox and the parties on August 26, 1999[12], Judge Fox granted Brown still another extension to September 17, 1999 in order to respond to Defendants' summary judgment motions. (*See* Fox Order dated August 26, 1999).

**Despite the above described extensions and warnings by the Court, Brown has not responded to Defendants' summary judgement motions.[13]**

Defendants' have supported their motions for summary judgment with Statements of Material Facts pursuant to Local Civil Rule 56.1, as well as numerous affidavits with accompanying exhibits. As noted, to date Brown has not filed papers in opposition to Defendants' summary judgment motions.

Since Brown has failed to file a Statement of Material Facts pursuant to Local

---

**10.** Defendants St. Francis Hospital and St. Agnes Hospital subsequently submitted their own motions for summary judgment, also prior to the taking of discovery.

**11.** The Order of Reference dated May 10, 1999 superseded an earlier Order of Reference dated May 6, 1999.

**12.** "During the conference on August 26, 1999, Assistant New York State Attorney General, Keith Brown, agreed to provide to plaintiff a copy of the written report generated as a

result of the recent IVP procedure administered to the plaintiff." (Fox Order dated August 26, 1999).

**13.** Though it may well be appropriate to grant Defendants motions for summary judgment by default (as contemplated by Defendants), since Brown is proceeding pro se, the Court has "gone the extra mile" on Plaintiff's behalf and reviewed and analyzed the merits of the case in making its decision here.

Civil Rule 56.1, Defendants' Local Rule 56.1 Statements are deemed to be admitted. *See* Local Civil Rule 56.1 ("[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party"); *United States v. All Right*, 77 F.3d 648, 657 (2d Cir.1996), *cert. denied*, 519 U.S. 816, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996)(holding that party's failure to controvert Rule 3(g) statement is treated as an admission of those facts); *Brown v. Croce*, 967 F.Supp. 101, 103 n. 3 (S.D.N.Y.1997)("[s]ince Brown has failed to file a Statement of Material Facts as to which he contends a genuine issue to be tried exists, the facts set forth in defendants' Local Rule 3(g) Statement are deemed to be admitted").[14]

## III. *Analysis*

### Summary Judgment Standard

■ Summary judgment may be granted only when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See Fran Corp. v. United States*, 164 F.3d 814, 816 (2d Cir.1999). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, the Court must " 'resolve all ambiguities and draw all reasonable inferences against the moving party.' " *Fran Corp.*, 164 F.3d at 816 (citation omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although the same standards apply when a pro se litigant is involved, "the pro se litigant 'should be given special latitude in responding to a summary judgment motion.' " *Shepherd v. Fraisher*, 1999 WL 713839 at *2 (S.D.N.Y. Sept.14, 1999) (citation omitted).[15] Furthermore,

**14.** Local Civil Rule 56.1 was formerly Local Civil Rule 3(g).

**15.** The State Defendants' Notice of Motion dated August 27, 1998, clearly provides as follows:

"PLEASE TAKE FURTHER NOTICE that pursuant to Rule t to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint, but you must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in defendants' affidavits will be accepted by the Court as true unless you submit affidavits or other documentary evidence contradicting our assertions. If you do not so respond, summary judgment will be granted against you, your case will be dismissed, and there will be no trial on your claims.

PLEASE TAKE EVEN FURTHER NOTICE that Civil Rule 56.1 of the Southern District of New York requires you to include a separate short and concise statement of any material facts as to which you contend there exists a genuine issue. In the absence of such statement, all material facts set forth in our Rule 56.1 statement will be admitted." (State Defs' Notice of Motion).

The Notice of Motion for both St. Francis Hospital and St. Agnes Hospital contain nearly identical warning/notice language to that of the State Defendants' quoted above. These notices, together with Judge Mukasey's Order dated September 8, 1998, clearly and effectively advised Brown "of the nature of a motion for summary judgment and the appropriate procedure." *Shepherd*, 1999 WL 713839 at * 2 n. 2. *See also Sawyer v. American Federa-*

the Court must liberally construe the claims of a pro se litigant. *See, e.g., Brown,* 967 F.Supp. at 103 (citing *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

■ "[S]ummary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998).

**Eighth Amendment Claim**

■ The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments" on prison inmates. The United States Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' … proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citation omitted). " 'Deliberate indifference' is demonstrated by proof that prison officials 'intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed.' " *Muhammad v. Francis,* 1996 WL 657922 at *5 (S.D.N.Y. Nov.13, 1996)(quoting *Estelle,* 429 U.S. at 104–05, 97 S.Ct. 285). An "inadvertent failure to provide adequate medical care" does not rise to the level of "deliberate indifference." *Estelle,* 429 U.S. at 105, 97 S.Ct. 285. *See also Muhammad,* 1996 WL 657922 at *5.

■ "Mere negligence in providing medical treatment or differences of opinion as to matters of medical judgment do not give rise to an Eighth Amendment claim." *Muhammad,* 1996 WL 657922 at * 5. *See also Estelle,* 429 U.S. at 106, 97 S.Ct. 285 ("a complaint that a physician has been negligent in diagnosing or treating a medi-

cal condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995)(citing *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))(deliberate indifference "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm"); *Gardner v. Zaunbrecher,* 1997 WL 602333 at * 1 (N.D.N.Y. Sept.22, 1997)("[i]t is well settled that mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment"). Prison officials have "broad discretion in determining the nature and character of medical treatment afforded to inmates, and inmates do not have the right to the treatment of their choice." *Gardner,* 1997 WL 602333 at *1. *See also Muhammad,* 1996 WL 657922 at *6 (prisoner "does not have the right to the treatment of his choice").

■ The Supreme Court has made clear that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. 285. Rather, the alleged conduct must be "repugnant to the conscience of mankind" or "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.' " *Muhammad,* 1996 WL 657922 at * 5 (citing *Estelle,* 429 U.S. at 102, 105, 97 S.Ct. 285).

■ "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway,* 37 F.3d at 66 (citation omitted). This "deliberate indifference" standard consists of both

*tion of Government Employees,* 180 F.3d 31, 34–35 (2d Cir.1999).

an objective and a subjective component. *See Ayala v. Bellevue Hospital*, 1999 WL 637235 at *4 (S.D.N.Y. Aug.20, 1999). First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Hathaway*, 37 F.3d at 66. *See also Muhammad*, 1996 WL 657922 at *5 ("alleged deprivation must be 'sufficiently serious' that it denies 'the minimal civilized measures of life's necessities' ") (citations omitted). Second, the charged official must act with a "sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66. *See also Muhammad*, 1996 WL 657922 at *5 (" '[d]eliberate indifference' exists when a prison official 'knows of and disregards an excessive risk to inmate of health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" ')(quoting *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In the instant case, plaintiff Brown has completely failed to satisfy the subjective component of the "deliberate indifference" test.[16] *See Ayala*, 1999 WL 637235 at *4 ("[d]ismissal of plaintiff's remaining claims is proper because the alleged conduct falls far short of the examples of 'deliberate indifference' cited in *Estelle* "). Brown does not dispute, and the evidence before the Court overwhelmingly establishes, that Brown was seen and treated for his (alleged) kidney stones and other ailments on numerous occasions by several different doctors and other medical personnel. It is also uncontroverted that Brown refused medical treatment on several occasions.

The gravamen of Brown's claim is that some his medical treatment was not to his liking and that he disagreed with some of the treatment and diagnoses that he received. *See Smitherman v. New York City Department of Correction Investigation Complaint Unit*, 557 F.Supp. 877, 877–78 (S.D.N.Y.1983)(use of improper drug to combat syphilis which caused alleged "negative side effects including bleeding, dizziness, respiratory difficulty and pain" amounted to a "claim for medical malpractice, not a Constitutional violation"); *Suarez v. Camden County Board of Chosen Freeholders*, 972 F.Supp. 269, 276 (D.N.J. 1997) (" '[w]here the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim" ') (citation omitted). As noted above, however, "[i]t is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation" and that "[a]lthough a prisoner is entitled to medical care, he does not have the right to the treatment of his choice." *Muhammad*, 1996 WL 657922 at *6. Here, Brown's medical treatment was well within the parameters of appropriate medical judgment and does not constitute an Eighth Amendment violation. The Court is in agreement with Judge Mukasey who observed that Brown's distress was not caused by any "indifference to his medical condition, deliberate or otherwise." (Mukasey Order dated June 18, 1998).[17]

---

**16.** Indeed, it is difficult to imagine any person— inmate or not—receiving more medical attention than plaintiff Brown has received.

**17.** The Court expresses no opinion as to whether Brown has adequately set forth a claim against any Defendant for medical malpractice. However, even if Brown's allegations were enough to sustain such a claim, that claim cannot be pursued in Federal court. *See Webber v. Hammack*, 973 F.Supp. 116, 124 (N.D.N.Y.1997) ("[i]t is axiomatic that 42 U.S.C. § 1983 does not provide a right of action for violations of state law") (citation omitted).

**Qualified Immunity Defense**

 Brown's claims against the State Defendants may (also) be dismissed on the grounds of qualified immunity. The Supreme Court has recently stated that "there is a strong public interest in protecting public officials from the costs associated with the defense of damages actions. That interest is best served by a defense that permits insubstantial lawsuits to be quickly terminated." *Crawford–El,* 118 S.Ct. at 1592–93. Thus, the defense of qualified immunity should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). In a case such as the one at bar, where a plaintiff alleges "a claim that requires proof of wrongful motive, the trial court ... must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." *Crawford–El,* 118 S.Ct. at 1596.

 It is well established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See also Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). "Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon,* 66 F.3d at 420. The Supreme Court explains that the qualified immunity standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law' ... [t]his accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter,* 502 U.S. at 229, 112 S.Ct. 534 (citations omitted).

Based on the record presented to the Court, it is clear that it was objectively reasonable for the State Defendants to believe that their actions were appropriate and lawful. *See Lennon,* 66 F.3d at 421 ("in qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene"). Furthermore, the record seems abundantly clear that none of the State Defendants knowingly engaged in conduct that violated Brown's Constitutional rights.

## IV. *Conclusion*

 For the foregoing reasons, the **motions for summary judgment of Defendants Dr. Norman Selwin, Dr. John Bendheim, Dr. Narendra Kotecha, Dr. George Owens, Physician Assistant Jean Carbone, St. Francis Hospital and St. Agnes Hospital are granted.**[18] **the Clerk is respectfully directed to enter judg-**

---

**18.** Though none of the parties raised the issue in their briefs, the Court notes that, pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), "an inmate must exhaust available administrative remedies before filing a lawsuit alleging a deprivation of medical care." *Wright v. Dee,* 1999 WL 350119 at *6 (S.D.N.Y. May 28, 1999). *See also Cruz v. Jordan,* 80 F.Supp.2d 109, 117 (S.D.N.Y.1999)(holding that "plaintiff's claim concerning defendants' deliberate indifference to his medical needs is an action 'with respect to prison conditions;' ... governed by the exhaustion requirement of section 1997e(a)"). Here, there is no indication in the

ment and dismiss this case.[19]

record whether or not Brown exhausted available administrative remedies.

19. Defendants St. Francis Hospital and St. Agnes Hospital have raised other arguments in their briefs that the Court need not address to reach the decision here.