**Brian PORTER, Plaintiff,**

v.

**Patrick R. DONAHOE, Postmaster General, U.S. Postal Service, Defendant.**

**No. 10 Civ. 3297(BMC).**

United States District Court, E.D. New York.

Aug. 23, 2013.

Brian Porter, Jamaica, NY, pro se.

James R. Cho, United States Attorneys Office, Eastern District of New York, Brooklyn, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

Plaintiff has brought at least five lawsuits and dozens of grievances against his employer, the United States Postal Service ("Postal Service"), going back to at least 1992, which have triggered at least three appeals to the Circuit, and one remand after the appointment of *pro bono* counsel that required additional findings but still resulted in the dismissal of the case. Some of plaintiff's complaints have encompassed events that were clearly materially adverse, like loss of pay, although none of those have been found to have any merit. Most have been the paradigm of petty slights.

The instant case involves claims of retaliation for his most recent Equal Employment Opportunity Commission ("EEOC") complaint. His claims, as in the past, are without merit and neither individually nor collectively meet the standard for raising a fact issue that a jury could reasonably determine in plaintiff's favor. Defendant's motion for summary judgment is granted and plaintiff's is denied.

## BACKGROUND [1]

Plaintiff's latest amended complaint reasserts the predominant legal theory from one of his prior complaints, *see Porter v. Potter*, 366 Fed.Appx. 195 (2d Cir. 2010), *granting summary judgment on remand,* No. 03–cv–6354 (E.D.N.Y. Feb. 4, 2011), which is to claim that the Postal Service retaliated against plaintiff for engaging in protected activity, *i.e.,* the filing of internal and EEO complaints. The main difference is that the current lawsuit is brought solely as a retaliation claim

---

1. Plaintiff's responsive Rule 56.1 statement was prolix and argumentative. However, I have not deemed the Postal Service's Rule 56.1 statement as undisputed, and have instead gleaned the undisputed facts from the record that both sides have placed before me.

under Title VII (the prior one included retaliation claims under the Family and Medical Leave Act) and pertains to the time period subsequent to the allegations from the 2003 action. *See Porter v. Donahoe*, 484 Fed.Appx. 589 (2d Cir.2012) (affirming dismissal of plaintiff's claims under the Family and Medical Leave Act).

The fulcrum of the amended complaint here is a Notice of Removal ("Removal Notice"), *i.e.*, a termination notice, issued by the Postal Service in December 22, 2007. The basis for the attempt to fire plaintiff was an impressive record of absenteeism and lateness. The Removal Notice itself was based on 16 absent or late to work days in the mere seven week period between October 10, 2007 and December 19, 2007. But in deciding to terminate him, the Postal Service took into account that plaintiff had 36 absent or late to work days between January 27, 2007 and March 31, 2007, which had resulted in a letter of warning, another 36 absent or late to work days between April 3, 2007 and June 2, 2007, for which he had been suspended for seven days, and another 31 absent or late to work days between July 16, 2007 and August 11, 2007, for which he had been suspended for two weeks.

Plaintiff, through his union, grieved the Removal Notice. The grievance process at the Postal Service is a multi-stage process that moves from conciliation to mediation and then, if unsuccessful, to arbitration. When the mediation here failed, the matter proceeded to arbitration. The Removal Notice had an effective date of February 6, 2008, and as the various steps of the grievance process played out, the Postal Service placed plaintiff on a non-pay status, subject to the outcome of the grievance process, beginning on the effective date of the Removal Notice.

The arbitration took place over a two-day period in November and December 2009, with the Arbitrator issuing his decision on December 19, 2009. He held that:

There was sufficient evidence to establish that the Postal Service had just cause to discipline the Grievant for his attendance related infractions. The Grievant's claim that he was entitled to protection under the Family Medical Leave Act [FMLA] for most of his absences is invalid because he had not worked sufficient hours to meet the FMLA qualifications. In addition, some of his absences were not related to family medical leave.

The Grievant's contention that he had been discriminated against and/or unfairly treated regarding his not being granted a change of work schedule is not supported due to the lack of any evidence that he had properly applied for such a change.

The union's argument that the Grievant had been treated differently than other employees in similar situations is not sustained due to the lack of sufficient evidence which would establish that the fact patterns and reasons for the resolution of those cases were the same as those involved in the Grievant's situation.

Nevertheless, although finding plaintiff "basically guilty as charged," the Arbitrator ruled that the Postal Service should have interviewed plaintiff before it issued the Removal Notice, instead of after, and that it should have considered whether there were other disciplinary options short of termination. The Arbitrator also found fault with the Postal Service's use of the same decision maker in the first two steps of the grievance process, logically concluding that this reduced the chances of a peaceful resolution. As a result, the Arbitrator ordered plaintiff's reinstatement but without any back-pay or benefits. In effect, this meant that the sanction approved

by the Arbitrator was a nearly two-year suspension without pay or benefits. Plaintiff returned to work on January 4, 2010, and as discussed below, he challenges this date as being ten days too late.

There was a further repercussion from this prolonged suspension. Although he was not receiving pay or paid benefits, plaintiff did not ask the Postal Service to suspend his health care benefits, and indeed plaintiff was aware that the Postal Service was continuing to pay the premiums for his health care and that he was not entitled to that benefit under the Arbitrator's decision. The record shows that the Postal Service does this for any employee on non-pay status up to 365 days. The Postal Service billed him periodically for the premiums during his suspension, which amounted to $599. Since he didn't pay the invoices, the Postal Service deducted the payments from his paycheck over three pay periods when he returned to work in early 2010.

That year did not see any improvement in the employment relationship. A number of events occurred, all of which plaintiff contends were in retaliation for his prior EEO complaints. First, in late January 2010, plaintiff and other employees were attending a safety lecture by a Postal Service Police Officer, and plaintiff started laughing at something that occurred on the other side of the room. The Police Officer told plaintiff not to disrupt her talk, and plaintiff asserts that he felt publicly humiliated. The Postal Service took no action concerning the incident, and plaintiff did not complain about it until this lawsuit. Nor is there evidence in the record that this particular Police Officer had any inkling of plaintiff's prior EEO complaints and contentious history with the Postal Service.

Next, on February 11, 2010, plaintiff requested administrative leave when he could not come to work due to blizzard conditions. The Postal Service had a policy of not granting administrative leave when a requesting employee had unused annual leave, as did plaintiff. This was a policy that the Postal Service had regularly applied to its employees, and the record confirms a number of identified employees who were treated the same way. However, the union filed a collective grievance for all of these employees, and the dispute over the policy was resolved retroactively.

Then, on February 19, 2010, plaintiff accessed a restricted area at the facility where he worked, even though, as he admitted in his deposition, he was aware of the Postal Service manual's prohibition on such access. He went there to deliver a letter complaining about deductions from his paycheck (possibly the recoupment of his health insurance premiums) to a Postal Service manager. This resulted in a one-day suspension without pay and confiscation of his employee badge. In addition, about a month later, a Postal Service Supervisor met with plaintiff to go over the incident and then issued a letter of warning. After plaintiff grieved these actions, the Postal Service rescinded the letter of warning and paid him for the time he had been docked.

On about six occasions between February 19, 2010 and April 15, 2010, plaintiff requested leave without pay. The Postal Service denied the requests, and charged plaintiff's absence against his annual leave. The record shows that this had also been done on a number of occasions for different employees who had unused annual leave pursuant to Postal Service policy—use your vacation, then ask for leave without pay if you need more. It does not appear that plaintiff's union ever grieved this policy.

In addition, on February 25, 2010, plaintiff left work early, complaining of job-related stress headaches, and did not re-

turn until March 9, 2010. He filed a workers' compensation application, a claim which, under Postal Service regulations, is decided by the U.S. Department of Labor ("DOL"). Plaintiff asked the Postal Service for a continuation of pay pending the DOL's determination. His request was denied because the Postal Service rejected his claim that his absence was job-related (subject to DOL determination), and instead charged his absence to sick leave and then, after his sick leave was exhausted, to annual leave. On April 26, 2010, the DOL denied plaintiff's workers' compensation claim.

Plaintiff had a similar problem on March 17, 2010, and reported that he was leaving work due to job-related stress. He did not file for workers' compensation but only requested continuation of pay for that day and leave without pay for the remainder of his absence through March 19, 2010. The Postal Service rejected this request and charged it to annual leave, since he had used up his sick leave.

## DISCUSSION

### I.  Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(c). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe the facts in the light most favorable to the nonmoving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586–88, 106 S.Ct. 1348 (emphasis removed).

In construing plaintiff's response to the Postal Service's motion, I take into account the fact that he is *pro se* and cannot be expected to have the same knowledge of procedural and substantive law as would an attorney opposing a motion. *See Brown v. Selwin*, 250 F.Supp.2d 299, 306 (S.D.N.Y.1999) ("Although the same standards apply when a pro se litigant is involved, the pro se litigant should be given special latitude in responding to a summary judgment motion.") (citation omitted). At the same time, this latitude is tempered somewhat by the fact that plaintiff, as described above, has considerable experience in litigating discrimination and retaliation claims against this very same defendant, particularly with regard to making and opposing summary judgment motions in the context of such claims. *See Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010).

### II.  Retaliatory Hostile Work Environment

██  To the extent that plaintiff is advancing a hostile work environment claim, the Court finds that the claim fails because even if any of the acts and conduct by defendant were retaliatory, they did not rise to the level of a workplace "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted)). Many of the incidents involved different managers and personnel, and were discrete acts that were triggered initially by plaintiff taking action that was simply not allowed of an employee. The employment relationship between the parties is no doubt dysfunctional, but it does not rise to the daily or severe harassment that the law requires for a hostile work environment claim and therefore, summary judgment is granted in defendant's favor on this claim.

### III. Retaliation Claim [2]

■■■ I evaluate a Title VII retaliation claim under the same three-step, burden-shifting framework used for an adverse employment claim as established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that (1) "he engaged in protected participation or opposition under Title VII ..., (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part in the adverse employment action." *Kessler v. Westchester Cnty. Dep't of Social Servs.,* 461 F.3d 199, 205–06 (2d Cir.2006) (citations omitted). In determining whether a plaintiff has satisfied this initial bur-

den, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005). The burden then shifts to the defendant to articulate a legitimate, non-retaliatory, reason for the employment action, and if he carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. *See Sista v. CDC Ixis North America, Inc.,* 445 F.3d 161 (2d Cir.2006).

At the outset, although there is no question that plaintiff has met the first and second factors for his *prima facie* case—engaging in protected activity of which the Postal Service was aware—there is some doubt as to *which* protected activity he is relying on, or if he is relying on them all or in some combination. His papers are not clear on the point, which I do not hold against him since he is a *pro se* litigant. But the fact remains that it is quite a mess to sort through. Since 1988, plaintiff has filed approximately 18 formal and two informal EEO complaints. Some of them have been filed after commencement of this lawsuit. They appear to cover all of the grievances that he is relying on in this action, but the EEO rejected three of them on procedural grounds without investigation.[3] Tying the particular EEO claim to the allegedly retaliatory disciplinary action could have some potential significance in terms of measuring the temporal proximity of the allegedly retaliatory discipline

---

2. Plaintiff originally brought a claim of racial discrimination but conceded at his deposition that he is not pursuing that claim.

3. The Postal Service contends that plaintiff has failed to exhaust his administrative reme-

dy with respect to these claims. I am not going to address that issue. As set forth below, they are plainly not material adverse events, and thus cannot be used to satisfy plaintiff's *prima facie* case.

to the particular protected activity. However, to give this *pro se* plaintiff the benefit of the doubt on this issue, I will assume he is claiming either that any EEO filing was the cause of the most temporally proximate alleged retaliatory action that followed that filing, or, alternatively, that every retaliatory action about which he is complaining was the result of his contentious history of EEO filings and lawsuits, whichever construct might better support the viability of his claims.[4] This seems appropriate since he has filed so many claims that one of them is virtually always temporally proximate to something about which he is complaining.

### A. Petty Slights and Annoyances

■ As to most of his claims, however, even this indulgent framework does not save his *prima facie* case. These claims are simply too trivial to satisfy the "adverse action" requirement for a *prima facie* case of retaliation. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), makes it clear that "petty slights and minor annoyances" are not actionable as retaliatory, and the majority of plaintiff's alleged retaliatory acts fall into this category no matter how broadly it is defined: (1) delaying his return to work by 20 minutes after his suspension, for which he was paid (he did not have his badge as a result of his suspension and it took that time to clear him through security); (2) requiring him to be escorted to the cafeteria during his arbitration hearing rather than letting him go where he wanted in the building (the Removal Notice had terminated him as an employee, subject to the grievance process, nearly two years earlier, so he was not an authorized person in the facility other than to participate in the arbitration); (3) being told by a Postal Service Police Officer during a group safety brief to stop disrupting her talk by laughing, which plaintiff admits he was doing (and there is no evidence that the Police Officer knew who he was, let alone of his contentious employment history, so it is impossible to see retaliation); and (4) denying his request for mediation of one of his EEO claims where the procedures are clear that the Postal Service has no obligation to mediate. The Postal Service's motion goes into exhaustive detail describing the facts behind each of these claimed retaliatory acts but I am not going to do that here; they are patently petty. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003) ("An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience . . .' ") (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000), quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)). Congress did not intend the federal courts "to act as a 'super personnel department' that second guesses employers' business judgments." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001) (quoting

---

**4.** This obviates the need to consider certain other activities which plaintiff claims are protected: two letters that he wrote to Postal Service managers, and his participation in the grievance of the Removal Notice. As to the letters, neither complained of discrimination or retaliation, and thus they do not constitute protected activity. As to grieving the Removal Notice, plaintiff did not complain in that proceeding of any discrimination or retaliation, instead relying solely on the "just cause" provisions of the collective bargaining agreement, and thus that is also not protected activity. *See Hubbard v. Total Communications, Inc.*, 347 Fed.Appx. 679, 681 (2d Cir. 2009) ("This court has interpreted the opposition clause to protect not only the filing of formal discrimination charges, but also 'informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.' ") (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990)).

*Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.1999)).

### B. Requests for Administrative Leave or LWOP

■ There are two other alleged adverse employment actions that the Postal Service claims are not material adverse events which require a bit more discussion. First, plaintiff asserts that the rejection of his requests for leave on the terms he demanded—either administrative, or leave without pay ("LWOP"), instead of sick leave and annual leave—constituted adverse employment actions. The case law suggests otherwise. *See Nidzon v. Konica Minolta Bus. Solutions, USA, Inc.,* 752 F.Supp.2d 336 (S.D.N.Y.2010) (denial of vacation time is not an adverse action, where all employees were subjected to the same policy); *Figueroa v. N.Y.C. Health and Hosps. Corp.,* 500 F.Supp.2d 224 (S.D.N.Y.2007) (holding that denial of medical leave and denial of plaintiff's choice of vacation time did not constitute an adverse employment action); *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534 (E.D.N.Y.2003) (denial of vacation leave is not adverse).[5] I agree with these cases. It was not as if plaintiff was told he could not take time off to which he was entitled. His request for one day of administrative leave due to a blizzard became moot when the union successfully resolved it on behalf of plaintiff and all of his co-employees, and while *Burlington* holds that an uncertainty as to whether backpay will be received over a

37–day period is materially adverse, *see Burlington,* 548 U.S. at 72–73, 126 S.Ct. 2405, uncertainty over a one-day period is not.[6] As to his request for LWOP instead of using his vacation, the Postal Service, on this motion, has documented a policy requiring use of annual leave rather than leave without pay. The record shows it has been regularly applied to many other, specifically identified, Postal Service employees. The economic rationale for the policy is obvious. Plaintiff lost nothing which he would have received but for his EEO filings.

### C. Premiums Deducted for Health Insurance

■ Second, plaintiff claims that the Postal Service should have notified him before it deducted the premiums for his health insurance. At least this claim, unlike the events described above, reflects a financial impact, which is perhaps the strongest indication of materiality. *See Ezuma v. City Univ. of N.Y.,* 665 F.Supp.2d 116 (E.D.N.Y.2009) (failing to stock professor's textbook in school book store deemed materially adverse because it could deprive him of sales revenue). But I am finding it on the immaterial side of the materially adverse line because, by plaintiff's own presentation of his claim, he does not dispute that he owed the money—the Arbitrator's decision made it clear that the Postal Service did not have to pay for these benefits—and the manner in which the Postal Service recouped its advances, through periodic paycheck deductions, can-

---

5. I place only light reliance on cases predating the Supreme Court's decision in *Burlington,* as *Burlington* expanded the standard for determining adverse action over that previously employed by the Second Circuit. *See Figueroa,* 500 F.Supp.2d 224. But it remains the case that an employer does not subject the employee to an adverse event by requiring the use of accrued vacation time before allowing an employee to take unpaid leave.

6. Indeed, there is a certain irony as to the result reached by the union. It is hard to reconcile giving Postal Service employees paid blizzard days off with the Postal Service's undertaking that "neither rain nor sleet nor snow shall stop these couriers from the swift completion of their appointed rounds."

not be reasonably challenged. Obviously, plaintiff cannot and does not claim that the Postal Service paid for his health insurance as an act of retaliation. Plaintiff had the option of declining coverage during his suspension but he did not (he attributes this to a "mistake" on his part, but that is immaterial). He received insurance coverage to which he was not entitled and had to expect to pay for it. He did not acquire the right to set his own terms as to when or how he had to reimburse the Postal Service for his insurance premiums.

### D. One–Day Suspension for Accessing a Secure Area and Ten–Day Delay in Return to Work

That leaves us, then, with the following potentially materially adverse acts: (1) the one day suspension for accessing a secure area; (2) a ten-day delay in returning him to work after the Arbitrator's decision; and (3) the Postal Service's failure to offer him an LCA to resolve his Removal Notice pre-arbitration. The Postal Service argues that although these events may be adverse actions (they plainly are), plaintiff cannot satisfy the fourth requirement for his *prima facie* case, *i.e.*, that there is a "causal connection" between plaintiff's activity and the adverse events.

■ Although the Postal Service's argument is not without force, I will assume *arguendo* that plaintiff has satisfied the *de minimis* burden required to establish a *prima facie* case for the first two claims. *See Hicks v. Baines,* 593 F.3d 159 (2d Cir.2010). I am so proceeding because, frankly, the application of steps two and three of the modified *McDonnell Douglas* analysis so clearly demonstrates the absence of a jury issue on these claims.

Let us start with the claims relating to his one-day suspension for improperly accessing a secure area, referred to as the "mezzanine level." The record shows that the restricted access was not aimed at

plaintiff; the Postal Service's manual clearly restricts worker access to approved areas, and for non-management employees like plaintiff, the mezzanine level was not one of them. It remains unclear how plaintiff gained access. It is undisputed why he gained access—he wanted to drop off a letter to a manager's office complaining about his paycheck—but he has offered no reason why, in a Post Office, of all places, he could not find a compliant method for delivering a letter. In any event, limiting employees to their work area is a legitimate business justification and easily satisfies step two of the *McDonnell Douglas* evaluative procedure.

As to step three, plaintiff has offered insufficient circumstantial evidence to suggest that the one-day suspension he received was in retaliation for his transgression. He admits he knew he wasn't supposed to be there. The sanction is proportionate to the transgression. The Postal Service had an obvious interest in enforcing its security procedures. Plaintiff has offered no evidence that any other trespassing employee was treated any differently. It is not "retaliation" when rules are broken and a proportionate punishment is imposed immediately in response. Especially in light of the fact that the Postal Service later rescinded the warning letter that plaintiff received and paid him for his time on suspension, no reasonable jury could find that any of plaintiff's EEO filings were a substantial factor in enforcing this access rule.

■ Plaintiff fares no better with respect to his claim of a retaliatory 10–day delay in returning him to work after the Arbitrator ordered his termination converted to a suspension. Although the Arbitrator's award is dated December 19, 2009, the record is undisputed that the Postal Service did not receive it until Monday, December 28, 2009. As in the pre-

ceding 20 months, plaintiff had not been scheduled to work that week because, as far as the Postal Service was concerned, he had been validly terminated. Considering plaintiff's prior work schedule and the intervening three day New Year's holiday, plaintiff was called back to work the first working day of the following week—Monday, January 4, 2010. The Postal Service thus was following a legitimate process in calling plaintiff back to work at the earliest practical opportunity. Indeed, had it required plaintiff to return on shorter notice, given the history between these parties, it is not a stretch to see that such action might well have triggered another EEO complaint. There is an absence of any circumstantial evidence upon which a reasonable jury could conclude that his return date was set for a retaliatory purpose.

### E. Failure to Receive a Last Chance Agreement to Resolve Removal Notice

■ Finally, plaintiff claims that the Postal Service, in retaliation for his EEO complaints, treated him less favorably than other employees by disciplining him more severely for his absenteeism and lateness. Specifically, plaintiff contends that the Postal Service failed to reduce his Notice of Removal even though it had reduced the Notices of Removal issued to other employees with similar histories of infractions by offering them a last chance agreement ("LCA").

I will again assume the first and second factors of plaintiff's *prima facie* case, as he did engage in abundant protected activity of which his employer was aware. As to the third factor, although plaintiff characterizes the "adverse action" against him as the failure to offer him an LCA, there is nothing adverse about that standing alone. No doubt, if the Postal Service had determined not to offer him an LCA, and had instead issued him another letter of warning concerning his violations, there would

be no adverse action. *See Chang v. Safe Horizons*, 254 Fed.Appx. 838, 839 (2d Cir. 2007) ("[O]ral and written warnings do not amount to materially adverse conduct …"); *Ward v. Empire Vision Centers, Inc.*, 686 F.Supp.2d 243, 250 (W.D.N.Y. 2010); *Collier v. City of New York*, No.07 cv 532, 2009 WL 464937, *6 (S.D.N.Y. Feb. 25, 2009). Rather, the adverse action was the Postal Service's termination of plaintiff, which was then commuted by the Arbitrator to a two year unpaid suspension. It was that attempted termination, followed by the suspension, about which plaintiff is complaining, and the loss of two years' pay is obviously adverse.

As to the fourth factor for his *prima facie* case, I will again assume that, because of the abundance of protected activity, there is a temporal connection between at least one of plaintiff's protected communications and his suspension that is sufficient to suggest causation. Although plaintiff offers comparator evidence in an effort to show that others with his attendance problems received an LCA, and such evidence can be considered in connection with the fourth factor for a *McDonnell Douglas prima facie* case, see *Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000), I think that in this case, that evidence is more appropriately considered in the context of the third step in the *McDonnell Douglas* analysis since, as a practical matter, it would require consideration of both sides' proffers.

At step two of the *McDonnell Douglas* analysis, the Postal Service has easily demonstrated a legitimate business justification for pushing plaintiff's termination instead of offering him an LCA. The record is undisputed, as noted above, that plaintiff was late or absent for 36 days between January 27, 2007 and March 31, 2007, which resulted in a letter of warning; another 36 days between April 3 and June

2, which resulted in a one-week suspension; and then 31 days between July 16 and August 11, which resulted in a two-week suspension. Only after this abysmal attendance record with continually increasing disciplinary measures did the Postal Service proceed with its attempt to terminate him.

Plaintiff's attempt to satisfy the third factor of the *McDonnell Douglas* analysis turns on his effort to show that other employees with abysmal employment problems were offered LCAs instead of termination or suspension. The Postal Service responds that, among other things, its grievance settlements with other workers are inadmissible under Fed.R.Evid. 408, and even if they are admissible, plaintiff's comparators are not sufficiently comparable under cases like *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997).[7]

■ The Postal Service only obliquely references what I think is dispositive of plaintiff's argument—the record is undisputed that on or about January 18, 2008, Harvey Kasuto, the Postal Service HR person handling plaintiff's grievance, offered an LCA to plaintiff's union representative. The record does not disclose whether the union representative rejected it, or whether he communicated it to plaintiff and plaintiff rejected it, but there is no evidence that the LCA was not offered to the union representative. For his part, plaintiff asserts that he would have accepted an LCA, but he offers no admissible evidence to counter the Postal Service's interrogatory answer, signed by Kasuto, that Kasuto offered an LCA to plaintiff's union representative. Obviously, if Kasuto offered an LCA to plaintiff's union representative, then that which plaintiff claims should have happened did happen, and he has no cause for complaint. Any lack of communication between plaintiff and his union representative is not the Postal Service's problem. *See Brown v. Parkchester South Condominiums, Inc.*, No. 00 cv 7235, 2006 WL 851789, *3 (S.D.N.Y. March 31, 2006) (although employee contended that his union never relayed a specific offer to him, "it was not unreasonable for [the employer] to convey that offer to the Union, rather than directly to him, since the parties were engaged in a grievance proceeding"), *rev'd on other grounds,* 232 Fed.Appx. 67 (2d Cir.2007).

In this regard, it is quite significant that the issues of whether some discipline less than suspension should have been imposed, and whether other employees with problematic attendance records had been treated differently, were specifically placed before the Arbitrator. In his decision, the Arbitrator disposed of them as noted above, and he also held that "Grievant was

---

**7.** This argument is without merit. Neither case cited by the Postal Service in support of its argument is binding or persuasive. The Tenth Circuit later clarified that its prior holding in *Carey v. U.S. Postal Serv.*, 812 F.2d 621 (10th Cir.1987), one of the two cases cited by the Postal Service, should not be read to "preclude all claims of discriminatory settlement of grievances," and concluded that the "circumstances of the contrasted grievance settlements," like any other instance of differential treatment, "[may be] asserted as evidence of pretext." *See Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1191 (10th Cir.2010) (citation omitted). Significantly, the Second Circuit has considered LCAs in the context of employment discrimination cases, *see Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir.2000), without even addressing Rule 408. Finally, the purpose of Rule 408 is to encourage settlements by preventing evidence of a prior settlement from being used to establish liability or damages in the present case. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820 (2d Cir.1992). Consideration of comparators' grievance settlements does not thwart the purpose of Rule 408.

unwilling to have his grievance resolved at any step."

Obviously, the Arbitrator's ruling is not dispositive of the issues here. But the Second Circuit made it clear in *Collins v. New York City Transit Authority*, 305 F.3d 113, 119 (2d Cir.2002), that

[A] decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—*e.g.*, new evidence not before the tribunal— or that the impartiality of the proceeding was somehow compromised. Here, however, the tribunal received all the available evidence in an evenhanded proceeding and rendered a decision consistent with the almost overwhelming evidence....

The procedural protections that plaintiff had here are every bit as good as those present in *Collins*. This was a neutral arbitration pursuant to a collective bargaining agreement before the Public Relations Employment Board. Both sides had a full hearing in which they submitted documents and evidence and which resulted in a reasoned decision that is internally consistent. The Arbitrator's decision is therefore entitled to serious consideration under *Collins*.

As noted, the Arbitrator's decision alone cannot extinguish plaintiff's claim that the Postal Service should have offered him an LCA. But it confirms the undisputed record evidence shows that the Postal Service did, in fact, offer an LCA to plaintiff's union representative and the matter went to arbitration regardless. The final confirmation of this fact is that nowhere in the record does plaintiff assert that he ever asked for an LCA, either from his union representative or the Postal Service. Plaintiff's retaliation claim therefore fails at the third *McDonnell Douglas* step.

Finally, I have to note that this case presents an unusual circumstance in considering plaintiff's retaliation claim. Plaintiff's extraordinary record of frivolous administrative and judicial litigation, characterizing even a speaker's request for quiet during a meeting as racial or retaliatory, is so extensive that, as a practical matter, it may be too much to ask the Postal Service to disregard his litigation history and exclude it from its determination of appropriate discipline when plaintiff again violates performance standards. In respect of his litigiousness, one would hope that plaintiff is *sui generis*. The record does not show that there are any employees who are comparable to plaintiff in using up his employer's (not to mention the Court's) resources. Rather, plaintiff has effectively made himself incomparable by becoming the ultimate Postal Service gadfly. It seems to me that it would be a legitimate business decision for the Postal Service, in looking at two employees with roughly equally horrendous attendance records, to treat plaintiff more severely because his frivolous litigation has needlessly cost the Postal Service so much in time, money and distraction, and it has every promise of continuing to do so in the future.

I recognize that just because a protected communication has no merit does not expose the employee to retaliation for having made his complaint. There cannot be a merits test to the determination of whether a communication is protected. Such a rule would obviously chill legitimate or arguably legitimate complaints and be inimical to the purpose for which a claim for retaliation exists. But plaintiff's pattern of frivolous litigation is so severe that it also

perverts the purpose of the law, diverting limited resources (I am referring principally to the Postal Service, but it is true to a lesser extent of the courts as well) from those who really, or even arguably, deserve them.

I emphasize that I am in no way deciding the present motions on this basis. The Postal Service has hewed to the calf's path and not even remotely suggested that plaintiff's frivolous use of the grievance and litigation process were factors in the attempt to terminate him, basing it wholly on his attendance record (which is enough). I am merely positing that at some extreme point, an employer should be able to take into account an employee's history of frivolous litigation in determining, when a severe work place infraction occurs, what level of discipline is appropriate. That would be the exercise of institutional responsibility, not retaliation.

## CONCLUSION

Defendant's motion for summary judgment [55] is granted. Plaintiff's cross-motion for summary judgment [69] and [71] is denied. The Clerk is directed to enter judgment dismissing the complaint. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**SO ORDERED.**